W.P., et al., Individually and as Representatives of a Class Pursuant to Fed. R.Civ.P. 23(a) and 23(b)(2), Plaintiffs,

v.

Deborah PORITZ, Attorney General of New Jersey; Jeffrey S. Blitz, Atlantic County Prosecutor; Charles R. Buckley, Acting Bergen County Prosecutor; Stephen G. Raymond, Burlington County Prosecutor; Joseph P. Audino, Acting Camden County Prosecutor; Stephen D. Moore, Cape May County Prosecutor; Neil S. Cooper, Acting Cumberland County Prosecutor; Clifford J. Minor, Essex County Prosecutor; Harris Y. Cotton, Gloucester County Prosecutor; Carmen Messano, Hudson County Prosecutor; Sharon B. Ransavage, Hunterdon County Prosecutor; Marryann K. Bielamowicz, Mercer County Prosecutor; Robert W. Gluck, Middlesex County Prosecutor; John Kaye, Monmouth County Prosecutor; W. Michael Murphy, Jr., Morris County Prosecutor; Daniel J. Carluccio, Ocean County Prosecutor; Ronald S. Fava, Passaic County Prosecutor; Ronald A. Epstein, Salem County Prosecutor; Melaine B. Campbell, Acting Somerset County Prosecutor; Dennis O'Leary, Sussex County Prosecutor; Edward Neafsey, Acting Union County Prosecutor; and John J. O'Reilly, Warren County Prosecutor, Defendants.

Civil Action No. 96–97.

United States District Court, D. New Jersey.

July 1, 1996.

Susan L. Reisner, Public Defender by Michael Buncher, Chief Counsel, Edward Barocas, Special Counsel, Special Hearings Unit, Office of Public Defender, Trenton, New Jersey, for Plaintiffs.

Deborah T. Poritz, Attorney General, by Jane Grall, Joseph L. Yannotti, Assistant Attorneys General, Rhonda S. Berliner–Gold, B. Stephan Finkel, Deputy Attorneys General, Trenton, New Jersey, for Defendant Deborah Poritz.

Clifford J. Minor, Essex County Prosecutor by Jane Deaterly Plaisted, Assistant Prosecutor, Newark, New Jersey, for Defendant County Prosecutors.

Dennis O'Leary, Sussex County Prosecutor by Thomas E. Bracken, Assistant Prosecutor, Newton, New Jersey, for Defendant Sussex County Prosecutor.

Ronald K. Chen, Rutgers Law School, Newark, New Jersey, for amicus curiae ACLU.

Faith S. Hochberg, United States Attorney by George S. Leone, Assistant United States Attorney, Newark, New Jersey, for amicus curiae United States of America.

BISSELL, District Judge.

In their Second Amended Complaint the plaintiffs in this class action assert that the New Jersey Registration and Community Notification Laws (hereinafter "Megan's Law") is unconstitutional as applied retroactively to the plaintiff class because it violates the *ex post facto* clause of the United States Constitution (Count II), its double jeopardy clause (Count III) and the procedural due process protections of the fourteenth amendment (Count IV). Count I sought a temporary restraining order and a preliminary injunction *pendente lite*. That relief has previously been granted as reflected in prior Opinions and Orders of this Court. Shortly after the filing of the Second Amended Complaint, this Court certified the following plaintiff class, constituting:

> All persons required to register as a sex offender pursuant to N.J.S.A. 2C:7–1 et seq. and whose offenses were committed prior to October 31, 1994, the effective date of the New Jersey Registration and Community Notification Laws, and who have been or will be classified as tier II or tier III offenders.

(Order, March 15, 1996).

Presently before the Court are plaintiffs' motion for summary judgment and defendant Deborah Poritz's motion for summary judgment on all Counts seeking final relief: Counts II, III and IV. All additional defendants, the county prosecutors, have joined in Attorney General Poritz's motion. Plaintiffs bring this action under 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(3). For the reasons set forth below, plaintiffs' motion is denied and defendants' motion is granted.

## *INTRODUCTION*

Society's concern about sex offenders is an issue which is extremely important in modern society. The many efforts to address this issue have failed as often as they have succeeded. There is still much to be learned about the cause of these acts and how best to combat them.

The lack of societal success in this area is demonstrated nowhere more poignantly than in the death of seven-year-old Megan Kanka. The shock that the community would normally feel at the brutal death of a child was magnified tenfold by the fact that the alleged perpetrator was a twice-convicted sex offender. Thus, it is natural and appropriate that this incident would spur the public to demand quick and decisive actions on the part of its government to curtail such tragedies in the future.

However, government is at all times constrained by the limitations placed on it by the United States Constitution and the balancing of political and societal values contained on its pages. The rights which this Court examines today "are towering constitutional provisions of great importance to individual dignity, freedom, and liberty." *Doe v. Poritz*, 142 N.J. 1, 43, 662 A.2d 367 (1995).

It must be clearly and emphatically stated that what the Court here undertakes is not a balancing of the rights of sex offenders against the rights of their victims. Rather, it is an analysis of the breadth of the rights which *every* American holds, and the constitutional limitations on a government's power to infringe them. When the government violates an individual's constitutional rights, regardless of the propriety of its motivation, it is this Court's duty, if requested, to identify and redress such a violation.

## I. *Megan's Law*

In order to evaluate the statutes involved in this case it is necessary to review the

circumstances that surrounded their passage. In the summer of 1994, seven-year-old Megan Kanka was abducted, molested and strangled near her home. (Cert. of Jane Grall, ¶ 2). The man accused of this reprehensible act, Jesse Timmendequas, was previously convicted of sex offenses involving young girls. (*id.*) The Kankas and many of the other neighborhood residents were unaware of the criminal history of Timmendequas and the other two convicted sex offenders with whom he lived. (*Id.*) Public reaction to this crime was intense and Governor Whitman and the State Legislature quickly responded to the clamor. Within one week of the discovery of Megan's body, both political branches had proposed extensive legislative and regulatory packages to address the issue. (*Id.*, ¶¶ 4–6).

Within a month, the first versions of the Community Registration and Notification laws passed the General Assembly and the Senate. (*Id.*, ¶¶ 13–15). In the General Assembly, the bills were declared "emergency" and therefore bypassed committee and were put to a vote the same day as the second reading. (*Id.*, ¶ 13). The bills were conferenced and amended, and ultimately were signed into law on October 31, 1994. (*Id.*, ¶¶ 13–19). The Registration and Notification statutes are two of ten statutes signed the same day which are collectively referred to as "Megan's Law" in memory of Megan Kanka. (Defendant's Br. at 3).

Megan's Law requires a system of registration for sex offenders and other offenders who have committed crimes against children [1]. (*Id.*) Once the individual has registered, he is then placed into one of three Tiers based upon the risk of reoffense, Tier I (low risk), Tier II (moderate risk), and Tier III (high risk). N.J.S.A. 2C:7–8. These classifications are made by the county prosecutors utilizing a "Registrant Risk Assessment Scale" developed by the Attorney General. (*Id.* at 3). Based upon the Tier Classification, segments of the public are provided with information about the registrant: law enforcement for Tier I; law enforcement and certain community organizations for Tier II; law enforcement, community organizations, and individuals likely to encounter the registrant for Tier III. (*Id.*)

Shortly after its passage, Megan's Law was challenged in both the federal and state courts. The Supreme Court of New Jersey addressed the issue in *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995). The *Doe* Court upheld the statute against *ex post facto*, double jeopardy, equal protection, administrative procedure act, privacy and due process challenges. *See Doe*, 142 N.J. at 12, 662 A.2d 367. That Court, however, found the statute to be lacking in its original form, and crafted a procedure of judicial review which it felt would adequately protect the liberty interests involved. *Doe*, 142 N.J. at 28–40, 662 A.2d 367. This holding was later augmented by that Court through a judicial order of October 23, 1995 specifically outlining the procedure to be followed in such review.

---

**1.** The individuals required to register are defined as those persons with:

(2) A conviction, adjudication of delinquency, or acquittal by reason of insanity for aggravated sexual assault; sexual assault; aggravated criminal sexual contact; kidnapping pursuant to paragraph (2) of subsection c. of N.J.S. 2C:13–1; endangering the welfare of a child by engaging in sexual conduct which would impair or debauch the morals of the child pursuant to subsection a. of N.J.S. 2C:24–4; endangering the welfare of a child pursuant to paragraph (4) of subsection b. of N.J.S. 2C:24–4; luring or enticing pursuant to section 1 of P.L.1993, c. 291 (C. 2C:13–6); criminal sexual contact pursuant to N.J.S. 2C:14–3b. If the victim is a minor; kidnapping pursuant to N.J.S. 2C:13–1, criminal restraint pursuant to N.J.S. 2C:13–2, or false imprisonment pursuant to N.J.S. 2C:13–3 if the victim is a minor and the offender is not the parent of the victim; or an attempt to commit any of these enumerated offenses if the conviction, adjudication of delinquency or acquittal by reason of insanity is entered on or after the effective date of this act or the offender is serving a sentence of incarceration, probation, parole or other form of community supervision as a result of the offense or is confined following acquittal by reason of insanity or as a result of civil commitment on the effective date of this act;
N.J.S.A. 2C:7–2(b)(2).

If the individual was not incarcerated, on probation, parole or other form of community supervision on the effective date of the statute, then registration is triggered by a finding by the original court of a pattern of repetitive, compulsive behavior. N.J.S.A. 2C:7–2(b)(1).

(Appendix to Brief in Support of Plaintiffs' Motion for Summary Judgment (hereinafter "Plaintiffs' App.") at A–306–28). The *Doe v. Poritz* Court also limited the scope of notification under Tier II and Tier III to those organizations and persons "likely to encounter" the registrant. *Doe,* 142 N.J. at 35–38, 662 A.2d 367.

## II. Artway v. Attorney General

### A. History

Prior to the Supreme Court of New Jersey's decision in *Doe,* the constitutionality of Megan's Law was addressed in this District in *Artway v. Attorney General,* 876 F.Supp. 666 (D.N.J.1995). Alexander Artway was found guilty of a sex offense and sentenced prior to the effective date of the statute. (*Id.* at 668). The trial judge found his conduct to be "characterized by a pattern of repetitive, compulsive behavior." (*Id.*) Prior to registration, Artway filed an action for a Declaratory Judgment to invalidate Megan's Law on the same grounds asserted by plaintiffs in the case at bar.

Judge Politan found the law to be violative of the *ex post facto* clause of Article I of the United States Constitution. In doing so, he applied the multifactor test enumerated by the Supreme Court in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963). (*Artway,* 876 F.Supp. at 688–92). Specifically, the court upheld registration and Tier I notification, and struck down notification at Tiers II and III. *Id.* That decision was appealed.

While the *Artway* case was pending on appeal, and after the *Doe v. Poritz* decision, the Attorney General and the county prosecutors began to implement the revised procedures for registration and notification. As registrants began to receive notice, several of them, including the plaintiffs in the instant action, sought preliminary injunctive relief from several judges in this district. That relief was granted in all instances, in part due to the pendency of the *Artway* appeal which could have been dispositive of this litigation.

Each of these actions was filed on an emergent basis, straining the court's resources. Therefore, on March 15, 1996, pursuant to the allegations of the Second Amended Complaint herein, a class action was certified describing the class as set forth above.

The preliminary injunction was scheduled to terminate "10 days after the Third Circuit has issued its opinion on the appeal of *Artway v. Attorney General et al.,* Docket Nos. 95–5195, 95–5157, 95–5194." The *Artway* decision was expected to be dispositive of the due process, double jeopardy, and *ex post facto* issues raised in connection with Megan's Law. However, the Third Circuit found that those claims as addressed to Tier II and Tier III designees were not ripe for review in that case. *Artway v. Attorney General,* 81 F.3d 1235, 1246–52 (3d Cir.1996). As a result, this Court extended its injunctive relief to allow the parties to address those issues through motion practice, for summary judgment or otherwise, if the claims of any of the present plaintiffs had ripened. (*See* Order of April 22, 1996). This Court now directly addresses the merits of plaintiffs' Constitutional claims.[2]

In considering its role in evaluating a statute such as Megan's Law, this Court draws upon the analysis of Justice Stein at the conclusion of his dissenting Opinion in *Doe v. Poritz.*

"The Legislature's value judgment about these laws is entitled to great respect, but that judgment comprises only one part of

---

**2.** It is very important that one understands what this case is not about. Aside from their due process argument, plaintiffs do not seek to have Megan's Law declared unconstitutional *ad infinitum,* no matter to whom it might be applied. Nor could they; for the plaintiff class members are only those who committed enumerated offenses before that law's enactment. Obviously, only plaintiffs so situated could attack Megan's Law on *ex post facto* and double jeopardy grounds, the very issues in the case at bar. This suit, therefore, does *not* contest the application of Megan's Law to persons who committed the enumerated sex offenses *after* the effective date of that law. A ruling in favor of the plaintiffs would limit significantly the number of persons subject to Tier II and Tier III notifications for much of this decade. However, by the turn of the next century, such notifications will increase as newly-convicted offenders are released, no matter what this Court's ruling in the present suit.

the constitutional equation. The judiciary's task is to complete the equation by evaluating the legislative determination in the context of settled Constitutional principles. Those principles are neither negotiable nor flexible, their importance having been conclusively determined more than two hundred years ago by the founding fathers. In applying those principles, we must bear in mind their origins: "The constitutional prohibitions against the enactment of ex post facto laws and [double jeopardy] reflect a valid concern about the use of the political process to punish or characterize past conduct of private citizens." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 513, 109 S.Ct. 706, 732, 102 L.Ed.2d 854, 895 (1989) (Stevens, J., concurring). In addition, we are reminded that retroactive statutes raise particular concerns. The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals. As Justice Marshall observed in his opinion for the Court in *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1982), the *Ex Post Facto* Clause not only ensures that individuals have "fair warning" about the effect of criminal statutes, but also "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id.*, at 28–29, 101 S.Ct. 960, 963–64, 67 L.Ed.2d 17 (1994).

The Constitution's prohibition against *ex post facto* laws reflects an enduring value that transcends the most pressing concerns of this or any day and age. Today, our concern is with prior sex offenders; in the 1950's the legislative concern focused on Communists; and in the 1860's Congress was determined to punish legislatively those who had supported the Confederacy. Future legislatures will doubtlessly find reasons to deal harshly with other groups that pose an apparent threat to the public safety.

\* \* \* \* \* \*

Despite the Legislature's understandable concern about the danger presented by prior sex offenders, the judicial role, mindful of the compelling pressures that led to the statute's enactment, is to test the statute on the basis of the Constitution's fundamental protection against punitive retroactive legislation."

*Doe v. Poritz*, 142 N.J. 1, 145–47, 662 A.2d 367 (1995).

However, this Court's analysis should not overlook present reality. Despite what "original intent" theorists would say, the United States Constitution is not mired in the life and times of the 1790's and earlier. The beauty of the Constitution is that it is a living document as applicable and vital in the 1990's as it was more than 200 years ago. The very exceptional men who drafted, debated and ratified the Constitution had the foresight to craft a rather brief document enunciating general principles; a document which they hoped would endure for several centuries as our forebears set the course of this country upon the noble experiment of representative government for and by a free people. Accordingly, while this Court must consider history in reaching its current decision, it does not do so bottled up in the era of the 17th and 18th centuries. This Court agrees with Justice Stein that constitutional prohibitions against *ex post facto* laws and double jeopardy serve as an appropriate check upon legislative excesses. However, when evaluating the New Jersey Legislature's response to *bona fide* societal concerns of the 1990's, the Court will consider this reality and will afford to that legislature the "respect" to which its "value judgment[s]" are entitled. *Doe v. Poritz*, 142 N.J. at 145, 662 A.2d 367.

### B. The Third Circuit Opinion

On appeal, the Third Circuit found that many of Mr. Artway's claims were not ripe because he had neither registered nor been classified by the appropriate county prosecutor's office. *Artway*, 81 F.3d at 1250. The court held that an individual must be more fully involved with the statutory scheme through registration and initial classification. (*Id.*) However, it was not deemed necessary

for an individual to have undergone actual notification before the challenge could be levied. *Artway*, 81 F.3d at 1250 n. 9.

The Third Circuit did find that Artway's challenges to registration and Tier I notification were ripe, and affirmed the district court's decision holding them to be constitutional. (*Id.* at 1271). The Third Circuit also conducted an exhaustive review of Supreme Court precedent and then articulated a "synthesis" of those decisions applicable to *ex post facto* and double jeopardy, upon which it formulated a test for determining when an act constitutes "punishment" under those provisions. (*Id.* at 1253–63). Although the issues regarding Tiers II and III were not ripe, the Court applied this test to both registration and Tier I. This highly structured formula was stated as follows:

A measure must pass a three-prong analysis—(1) actual purpose, (2) objective purpose, and (3) effect—to constitute nonpunishment. We must look at actual purpose to see "whether the legislative aim was to punish." *See De Veau [v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960) ]. If the legislature intended Megan's Law to be "punishment," i.e., retribution was one of its actual purposes, then it must fail constitutional scrutiny. If, on the other hand, "the restriction of the individual comes about as a relevant incident to a regulation," the measure will pass this first prong. Id.

If the legislature's actual purpose does not appear to be to punish, we look next to its "objective" purpose. This prong, in turn, has three subparts. First, can the law be explained solely by a remedial purpose? *See Halper,* 490 U.S. at 448, 109 S.Ct. at 1901–02. If not, it is "punishment." Second, even if some remedial purpose can fully explain the measure, does a historical analysis show that the measure has traditionally been regarded as punishment? *See Austin,* 509 U.S. [602] at 610–12, 113 S.Ct. [2801] at 2806. If so, and if the text or legislative history does not demonstrate that this measure is not punitive, it must be considered "punishment." Third, if the legislature did not intend a law to be retributive but did intend it to

serve some mixture of deterrent and salutary purposes, we must determine (1) whether historically the deterrent purpose of such a law is a necessary complement to its salutary operation and (2) whether the measure under consideration operates in its "usual" manner, consistent with its historically mixed purposes. *See Kurth Ranch,* 511 U.S. at ——–——, 114 S.Ct. at 1946–48. Unless the partially deterrent measure meets both of these criteria, it is "punishment." If the measure meets both of these criteria and the deterrent purpose does not overwhelm the salutary purpose, it is permissible under Kurth Ranch.

Finally, if the purpose tests are satisfied, we must then turn to the effects of the measure. If the negative repercussions—regardless of how they are justified—are great enough, the measure must be considered punishment. *See Morales,* —— U.S. at ——, 115 S.Ct. at 1603. This inquiry, guided by the facts of decided cases, is necessarily one "of degree." *See id.*

*Artway,* 81 F.3d at 1263.

### III. United States v. Usery

Poised to apply the *Artway* formula, this Court on June 24, 1996 received the United States Supreme Court's opinion in *United States v. Ursery,* —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), which alters the analysis to be employed in the case at bar.

*Ursery* involved two separate double jeopardy challenges to civil forfeiture statutes, 21 U.S.C. § 881(a)(6) and 21 U.S.C. § 881(a)(7). (*Ursery* at ——–——, 116 S.Ct. at 2138–40). In a case coming from the Sixth Circuit, civil forfeiture proceedings were instituted against Guy Ursery's home, and following the resolution of that action he was indicted for manufacturing marijuana. (*Id.* at ——, 116 S.Ct. at 2138–39). In a companion case from the Ninth Circuit [*U.S. v. $405,089.23,* 33 F.3d 1210 (9th Cir.1994) ], the civil forfeiture action was instituted following the criminal conviction of petitioners Alt and Wren. (*Id.*) Both the Sixth and Ninth Circuits found the second proceeding to be unconstitutional and violative of the Double Jeopar-

dy Clause. (*Id.*) The Supreme Court reversed. (*Id.*)

The Courts of Appeals based their decisions largely on the holding in *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), which they believed stood for the proposition that all *in rem* civil forfeitures under 21 U.S.C. § 881 were "punishment" for the purposes of Double Jeopardy. *See United States v. Ursery,* 59 F.3d 568, 572–73 (6th Cir.1995); *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210, 1219–22 (9th Cir.1994).

The Supreme Court rejected this contention, stating the "holding of *Austin* was limited to the Excessive Fines Clause of the eighth amendment, and we decline to import the analysis of *Austin* into our double jeopardy jurisprudence." (*Ursery* at ——, 116 S.Ct. at 2146–47). Furthermore, in footnote 2 of the majority Opinion, the Supreme Court limits the applicability of *Halper,* confining it to a much narrower scope than that suggested by Justice Stevens' dissent in *Ursery* and employed by the Third Circuit in *Artway.* (*Ursery* at ——, 116 S.Ct. at 2144–45). The Court went on to say that "nothing in *Halper,*[3] *Kurth Ranch,*[4] or *Austin,* purported to replace our traditional understanding that civil forfeiture does not constitute punishment for the purpose of the Double Jeopardy Clause.... None of those cases dealt with the subject of this case: *in rem* civil forfeitures for the purpose of the Double Jeopardy Clause." (*Ursery* at ——, 116 S.Ct. at 2146). Instead, the Supreme Court based its analysis on a line of cases dealing with civil forfeiture, *Waterloo Distilling Corporation et al. v. United States; Various Items of Personal Property,* 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558 (1931); *One Lot Emerald Cut Stones and One Ring v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972); and *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984). (*Ursery,* at ——, 116 S.Ct. at 2146–49).

This Court recognizes that it is bound by whatever Third Circuit precedent governs its

inquiry. It may neither ignore nor reject such precedent. In the case at bar, however, the particular, compartmentalized approach of *Artway* need not and should not be followed, because it is not binding precedent for the issues and claims presented in the cross-motions for summary judgment.

First, and least significant to the analysis of *Artway*'s precedential value, is the fact that the claims in *Artway* attacking Tiers II and III were specifically found to be not ripe for adjudication. If this were all, the Court would apply the structured *Artway* pattern because it was both enunciated and then applied to the registration and Tier I notification features of Megan's Law; but there is more.

Secondly, *Artway* itself recognized the limitations of its own conclusions:

> We have thus attempted to harmonize a body of doctrine that has caused much disagreement in the federal and state courts. We realize, however, that our synthesis is by no means perfect. Only the Supreme Court knows where all the pieces belong. The Court will, we hope, provide more guidance with its decision in *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210 (9th Cir.1994), amended on denial of rehearing, 56 F.3d 41 (1995), cert. granted, —— U.S. ——, 116 S.Ct. 762, 133 L.Ed.2d 707 (1996), or some other case in the near future. With this qualification in mind, we turn to the application of this test to Megan's Law.

81 F.3d at 1263.

Through *Ursery* (the same case noted above by the Third Circuit), the U.S. Supreme Court has now spoken, and has presented a different approach to the issues which were then before *Artway* and are now before this Court.

Thirdly, *Ursery* expressly rejects the philosophical foundation of *Artway:* that a universal rule for the definition of "punishment" can and should be derived through a "synthesis" achieved from analyzing the Su-

---

3. *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).

4. *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994).

preme Court's recent decisions in *Halper, Austin, Kurth Ranch* and *Morales.*[5] Not only is that evident from Justice Rehnquist's Opinion itself, it is highlighted by a comparison of that Opinion with the global (*Artway*) approach advocated by Justice Stevens in his dissent. *Artway*'s synthesis does not survive *Ursery*, a ruling by the highest court of the land, which this Court must follow.[6]

■ The Supreme Court has now stated that *Halper, Austin, Kurth Ranch,* (by implication *Morales*), and now *Ursery* cannot be employed to establish a "synthesis" that generates a universal analytical framework for defining "punishment" in all cases.[7] That determination does not, however, require this Court to relegate each of those cases to a narrow context and thereafter decline to consult them for guidance in deciding the case at bar. Certain considerations common to those cases counsel this Court to employ them in deciding whether the Tier II and/or Tier III notification provisions of Megan's Law impose "punishment." These common considerations are the expressed intent of the legislature as reflected in the legislation itself and the legislative history; the "purpose" of that legislation, viewed objectively, particularly if that demonstrates a potential for a more punitive objective; a balancing of remedial and punitive goals; an analysis of how such laws have been considered historically, if there is any clear historical analogue; and a review of the "effect" of such legislation, if that effect is extreme or severe. Not surprisingly, each of those considerations was recognized in *Artway*. What *Ursery* teaches us, however, is that such considerations may not be transformed into a rigid series of hurdles which must be surmounted, one after the other, before the legislation can survive an *ex post facto* or double jeopardy challenge. Rather this Court, in an analysis similar to that in *Kennedy v. Mendoza-Mar-*

*tinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (although the factors considered are not identical), must weigh these considerations in a less structured fashion to reach its decision. *Ursery* also instructs this Court to focus primarily upon precedent most closely resembling the facts, issues and constitutional provisions involved in the case at bar.

Employing the analysis set forth above, this Court holds that Tier II and Tier III notifications applied to members of the plaintiff class do not violate their rights under the *ex post facto* and double jeopardy clauses.

### IV. Summary Judgment

■ Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (*en banc*), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and must resolve any reasonable doubt as to the existence of a genuine issue of fact against the moving party. *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of establishing that there exists no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The Supreme Court has stated that, in applying the criteria for granting summary judgment,

the judge must ask ... not whether ... the evidence unmistakably favors one side

---

**5.** *California Dept. of Corrections v. Morales,* —— U.S. ——, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995).

**6.** Plaintiffs argue that this Court must apply *Artway*'s analytical pattern and wait for the Third Circuit to decide the impact of *Ursery* upon it. For the reasons set forth above, this Court disagrees. Relatedly, plaintiffs assert that this Court should not speculate how the Third Circuit

would treat *Ursery* and then proceed to rule based on such speculation. However, that is not what this Court is doing; it is making its own determination of the significance of the *Ursery* decision and applying that determination here.

**7.** As to *Halper,* this result was foreshadowed by Judge Shadur's concurring Opinion in *Artway.* 81 F.3d at 1271–73.

or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict. . . .

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. (*Id.*)

 In order to survive a motion for summary judgment, a plaintiff must present "more than a mere scintilla of evidence" in his favor. He cannot simply reallege factually unsupported allegations contained in his pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990). Only evidence that would be admissible at trial may be used to test a summary judgment motion. Evidence with a deficient foundation must be excluded from consideration. *Williams v. Borough of West Chester, PA*, 891 F.2d 458, 466 (3d Cir.1989); *see also Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890–91 (3d Cir.1992).

There is no dispute as to the material facts in this case. Any factual disagreement lies in the area of which facts are relevant to the Court's analysis. The case is therefore amenable to summary judgment.

## V. Ripeness

 Article III's case or controversy mandate requires that a party suffer actual injury or be in imminent danger of doing so, before a statute may be challenged. *Artway,*

81 F.3d at 1246. This ripeness requirement prevents a court from becoming entangled in abstract disagreements. (Id.) In determining whether an issue is ripe for adjudication, two factors must be considered: "(1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." *Artway,* 81 F.3d at 1247 (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967)).

 The hardship prong dictates that the threat be "'credible' and not merely 'speculative.'" (*Id.*) "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979) (quoting *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973)).[8]

 The threat of the application of Megan's Law to the class members is certainly credible under this standard. Artway's claims were unripe because he had neither registered nor been classified in a given Tier. *Artway,* 81 F.3d at 1248. By contrast, individuals do not become members of the class until they have registered and county prosecutors have made and noticed an initial Tier II or III designation. At this point, unless the registrant takes affirmative action for review, notification at a specified level is a foregone conclusion.

The second prong of the test is whether the issues have been sufficiently explicated to provide for judicial review. (*Id.* at 1249). The voluminous submissions to the Court by all parties, including copies of the Registrant Risk Assessment Scale forms, Superior Court orders, legislative history, affidavits, newspaper articles, and expert reports provide more than adequate factual underpin-

---

**8.** The present classification and notification hearings are not criminal proceedings; however, the standard for ripeness enunciated in *Babbitt* is equally applicable to non-criminal proceedings.

ning for this Court's analysis. Furthermore, the "district court enjoys flexibility to collect appropriate evidence so that the issue may be fit for judicial review." (*Id.* at 1250 n. 9).[9] The plaintiffs' claims are ripe for this Court's review.

## VI. *Ex Post Facto and Double Jeopardy*

■ Article I, § 10 of the United States Constitution prohibits the passage of *ex post facto* laws [10]. U.S. Const. art. I, § 10. This limitation on the power of the legislature was forged out of the experiences of the Constitution's drafters under the Parliament of Great Britain which had the authority to pass such laws. *See Calder v. Bull,* 3 U.S. (3 Dall.) 386, 389, 1 L.Ed. 648 (1798). The *ex post facto* clause was adopted because "the framers of the Constitution viewed with some apprehension the violent acts which might grow out of the feelings of the moment, ... the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed." *Cummings v. Missouri,* 71 U.S. (4 Wall) 277, 322, 18 L.Ed. 356 (1867); *see also Calder,* 3 U.S. at 389, 1 L.Ed. 648 ("With very few exceptions, the advocates of such laws were stimulated by ambition, or personal resentment, and vindictive malice.")

As the Supreme Court so aptly stated in *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925):

> It is settled, by decisions of this court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the

time when the act was committed, is prohibited as *ex post facto.*

It is without dispute that Megan's Law applies to acts committed prior to its effective date, therefore this Court must address the "more burdensome ... punishment" prong to determine if there is an *ex post facto* violation. *See, e.g.* N.J.S.A. 2C:7–2(b)(1).

Similarly, the double jeopardy clause "prohibits governments from punishing citizens a second time for the same offense for which they had previously been punished." *Artway,* 876 F.Supp. at 685. Specifically, it states: "nor shall any person be subject for the same offense to be twice put to jeopardy of life or limb." U.S. Const. amend. V. This prohibition applies equally to "a second prosecution for the same offense after conviction ... and multiple punishments for the same offense." *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). Each of the class plaintiffs has been previously convicted of a sex related or other offense which makes him subject to Megan's Law, and triggers this secondary requirement.

Thus under both the *ex post facto* and Double Jeopardy Clauses, "[t]he threshold question ... is whether the [notification] provisions of Megan's Law impose 'punishment.'" *Artway,* 81 F.3d at 1253. If Tier II and Tier III notification does not constitute punishment, then there can be no violation of either clause; if it does, then both would be violated in the case at bar. (*Id.*)

## VII. *Punishment*

### A. *Scope of Impact*

Central to the analysis of Megan's Law is the scope of the impact that can be attributed to the legislation. There have been a few highly publicized incidents of vigilantism involving assault, arson, and death threats against sex offenders following notification.[11]

---

**9.** The Third Circuit panel was aware of the instant action when it provided this guidance in footnote 9 of its Opinion.

**10.** An *ex post facto* law is defined as "a law passed after the occurrence of a fact or commission of an act, which retrospectively changes the legal consequences or relations of such fact or

deed." Blacks Law Dictionary, 580 (West Sixth Ed.1990) (citations omitted).

**11.** In Washington, the home of Joseph Gallardo was burned down following community notification. *See* Jim Hooker, *Megan's Law Has a Harsh Prototype, The Record,* Northern New Jersey, Oct. 10, 1994. In New Jersey, Thomas Vicari was attacked and beaten by two men who mistakenly

However these criminal acts cannot be included within the statutory bounds of Megan's Law. The state and county prosecutors make it clear that such actions will be prosecuted, and appear to be doing so. Indeed the notifications to organizations and the community address that prospect specifically. For example, the notifications sent out in Union, Warren, Cape May, Hunterdon, Mercer, Morris and Ocean Counties state:

> Any action taken by you against this individual, including vandalism of property, verbal or written threats of harm or physical assault against this person, his family or employer will result in your arrest and prosecution for criminal acts.

Middlesex County uses that language for Tier III notifications. Some other counties have drafted similar language themselves, such as Sussex County:

> ... law enforcement will carefully investigate all allegations of harassment and other criminal or disorderly conduct taken by a person against a registrant, the registrant's family, or the registrant's employer and that law enforcement will vigorously prosecute where appropriate.

On the other hand, the impact of Megan's Law cannot be limited to the act of notification itself. Defendants argue that the purpose of the statute is "'to enable the public to protect itself from the danger posed by sex offenders'" (Defendant's Br. at 12 (quoting *Doe*, 142 N.J. at 73, 662 A.2d 367)). Therefore, members of the public must take some action to protect themselves from this identified threat if this goal of the statute is to be achieved. It cannot seriously be argued that the legislature intended or expected that people would continue their behavior unmodified after receiving notification.

The acts which members of the public might take following notification include all *legal* actions, such as warning their children, limiting or eliminating contact with the registrant, refusing to do business with the registrant's employer, refusing to work with a registrant, legal eviction, and others. It would also include direct actions against the registrant that do not rise to the level of

criminality such as picketing or boycotting businesses, name calling, ostracism of family members, discussion in the community, newspaper articles, discussion on radio talk shows, further dissemination of notice to the community, refusal to hire, and refusal to purchase property from registrant. Such actions are presented in the record developed for the cross-motions. They must, to some degree, be considered the natural and anticipated outgrowth of the legislation and implementing regulations.

Defendants further argue that the notification at Tier II should be distinguished due to its limited scope and distribution. However, as a practical matter, this Court does not find an appreciable difference between the two Tiers. Tier II notice is available to many organizations in a community, and to many people in those organizations. Although the initial distribution is limited in scope, "Tier Two notification can easily amount to the same notification as required for Tier Three" without appropriate safeguards. *Doe*, 142 N.J. at 35, 662 A.2d 367.

At present the organizations that are eligible to receive Tier II notification include those "that conduct activities involving the care and/or supervision of children such as community CrimeWatch programs, Big Brothers and Big Sisters, Girl and Boy Scouts, ... parent-teacher organizations ..., battered women's organizations, rape victim support groups and women's advocacy groups" if they request it. (Megan's Law A Guide for Community Organizations, Schools and Day Care Centers, at A–333). Schools, licensed day care centers and summer camps will automatically receive notification. (*Id.*)

Once the information has been received, it is intended to be distributed to the staff with instructions to maintain confidentiality. While the Court will not assume that conscientious persons would willfully violate instructions regarding confidentiality, human nature being what it is, it is doubtful that Tier II confidentiality will always be pre-

---

believed him to be the sex offender who resided at that address. *See* "Sex Offender Targeted in Home Attack," *The Express–Times*, January 10, 1995.

served.[12] That is not to equate such breaches with "punishment," however. That consideration will be addressed hereafter. The case of E.B. provides a concrete example of what can occur when the confines of the dissemination of notice are breached. The plaintiff in that case was identified using fictitious initials; however, utilizing information about the registrant which was disclosed in open court and in newspaper accounts, the Guardian Angels organized a manhunt for the identity of E.B. Ultimately, Mr. Harold Turner discovered E.B.'s identity and disclosed it on a local radio talk show. (A–114–26).[13]

### B. Expressed Legislative Purpose or Intent

The first factor which this Court addresses in its "punishment" inquiry is the subjective or actual intent of the legislature in passing the statute. (Artway, 81 F.3d at 1254–56; see also De Veau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960)). There is little evidence of the legislative intent, but that which does exist supports a remedial purpose for the statute. The statement of purpose in the statute reads:

The Legislature finds and declares:

a. The danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness, require a system of registration that will permit law enforcement officials to identify and alert the public when necessary for the public safety.

b. A system of registration of sex offenders and offenders who commit other predatory acts against children will provide law enforcement with additional information critical to preventing and promptly resolving incidents involving sexual abuse and missing persons.

N.J.S.A. 2C:7–1. Similar sentiments were also part of the bill as introduced to the Senate. See Artway, 81 F.3d at 1264. The Court also determines that such actual legislative intent prompted the law's provisions on notification as well as registration.

■ The general dearth of legislative history is due to the manner in which the legislation was rushed to the floor without committee referral or debate. (Id.; see also Grall Cert., ¶ 13). However, at this stage of the analysis, the stated purpose is sufficient to establish the subjective intent of the New Jersey Legislature.[14]

### C. Objective Purpose

■ The next stage in the analysis is to examine the objective purpose of the statute to see if it arose out of the "sudden and strong passions" which the ex post facto clause is designed to combat. Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 137–38, 3 L.Ed. 162 (1810). The Court will here examine the remedial purposes presented, any punitive goals necessarily implicated and whether, if the statute has mixed objectives, the deterrent purpose is a usual and necessary complement to the salutary one. Artway, 81 F.3d at 1263.

---

12. However, violations of the realm to which notification should be confined are neither promoted nor ordered by state authorities and courts. One jurist, the Honorable Peter Ciolino, AJSC, Bergen County, has included in his Orders a warning of contempt sanctions against those who improperly disseminate Tier II information. Because Judge Ciolino is the state-wide coordinator for classification/notification proceedings in the Superior Court, Law Division, one can properly infer that the judges assigned in other counties are aware of and would soon follow his example when the present preliminary injunction is lifted.

13. Defendants argue, somewhat persuasively, that such actions will diminish significantly when Megan's Law is implemented, particularly as time passes and the police forces and community organizations receiving notification become more knowledgeable about their obligations. One would hope so. Private witch hunts and self-promotional demagoguery at another's expense have no place in the administration of Megan's Law.

14. Although it may be appropriate to look beyond the stated legislative intent in determining the actual purpose of the statute, to do so in this instance would merely serve to duplicate the objective purpose inquiry, infra.

### 1. Remedial Purpose

*Artway* is helpful here, even though its rigid format, with successive hurdles to sustain the law, is inconsistent with *Ursery*. In the words of *Artway,*

> The threshold question is thus whether a remedial purpose can explain the sanction. Only if the remedial purpose is insufficient to justify the measure, and one must resort also to retributive or deterrent justifications, does the measure become punitive. Only then can the measure *"only* be explained as also serving either retributive or deterrent purposes."

(*Id.* at 1255) (emphasis in original). The *Artway* court defined some of the significant terms in this part of the analysis as follows:

> Because *Halper* occupies such a central role in the punishment inquiry, a number of explanatory observations are in order. The first is a matter of semantics: a clear understanding of the terms "retributive," "deterrent," and "remedial" is critical to applying the *Halper* test. We therefore explain how we think the Supreme Court is using them. Retribution is vengeance for its own sake. It does not seek to affect future conduct or solve any problem except realizing "justice." Deterrent measures serve as a threat of negative repercussions to discourage people from engaging in certain behavior. Remedial measures, on the other hand, seek to solve a problem, for instance by removing the likely perpetrators of future corruption instead of threatening them (*De Veau*), or compensating the government for costs incurred (*Halper*).[15]

(*Id.* at 1255). Under *Ursery*, deterrence is not synonymous with punishment:

> Third, though both statutes may fairly be said to serve the purpose of deterrence, we long have held that this purpose may serve civil as well as criminal goals.... We recently reaffirmed this conclusion in *Bennis v. Michigan, supra* [516 U.S. ——], at ——, 116 S.Ct. [994] at 1000 [134 L.Ed.2d 68 (1996) ], where we held that "forfeiture serves a deterrent purpose distinct from any punitive purpose."

—— U.S. at ——, 116 S.Ct. at 2149.

Viewed objectively, there are significant remedial goals intended and served by Megan's Law. Its primary focus is the protection of children and others from previously-convicted sex offenders, near them in the community, who have been found to have a moderate or high risk of re-offense. The tailored notification for each Tier II and Tier III offender is designed to serve that remedial goal. An objective deterrent purpose also emerges from the statutory scheme. Aware that he is registered with local authorities and that his identity has been revealed to certain segments of the community, the Tier II or III offender should be deterred from recidivism, at least in the areas where he lives and works. This "deterrent purpose of ... the law is a necessary complement to its salutary [remedial] operation." (*Artway,* 81 F.3d at 1263). Accordingly, its deterrent function is best classified as predominantly civil not criminal. The "mixture of deterrent and salutary purposes" (*ibid.*) driving Megan's Law does not make its notification features "punishment."

No persuasive argument can be made that, even viewed objectively, the legislative purpose behind Megan's Law was retributive. It is not an instrument of "vengeance for its own sake", rather it "seek[s] to affect [a broad range] of future conduct" by registrants and the public alike. (*Id.* at 1255). It has goals of preventing or at least decreasing the opportunity and incentive for a societal problem: sexual molestation and similar enumerated offenses. The means employed (Tier II and III notifications) are directly proportional to the ends which Megan's Law is designed to serve. Viewed objectively, there are no punitive, penal purposes motivating Megan's Law; it is a remedial statute.

### 2. Historical Analysis

Although this Court is wary of applying *Austin* in the case at bar, due to the *Ursery* decision, and although the latter also teaches that the rigid format resulting from *Artway*'s efforts at "synthesis" was

---

**15.** *Ursery*'s limitations on the use of *Halper* do not affect the validity of these definitions.

ill-conceived, nevertheless, all informative precedent, including *Ursery,* instructs that in determining whether particular conduct constitutes "punishment," one should search for and examine any historical antecedents. In some cases, such as *Ursery,* this is a rather easy task. Citing a line of statutes and cases spanning more than 200 years, including three more recent decisions directly on point,[16] the Court in *Ursery* held that, historically, civil *in rem* forfeitures had never been considered punishment. However, the classification and notification provisions of Megan's Law measured against the Constitution's *ex post facto* and double jeopardy clauses have no such identical historical antecedents. While it is tempting to end the inquiry at that, declaring this factor inapplicable to the case at bar, the Court will resist that temptation, particularly in light of the considerable emphasis placed upon this issue by all parties.

The "appropriate concern in a historical inquiry is the nature of the measure itself." *Artway,* 81 F.3d at 1257. If the impact of the law is one that was historically regarded as punitive then it "is punishment unless the text *or* legislative history shows a contrary purpose." (*Id.*) (emphasis added).

This does not require that the same provisions existed in the law at the time of the drafting of the Constitution. Rather, the evaluation must be done through the prism of modern life and technology to determine if the measures are "sufficiently analogous to the early forms of punishment ... to label them punishment in their own right." Michelle Pia Jerusalem, *A Framework for Post–Sentence Sex Offender Legislation: Perspectives on Prevention, Registration, and the Public's Right to Know,* 48 Vand. L.Rev. 219, 230 (1995).

Although incarceration and fines are the primary method of punishment in modern American society, this is a relatively recent development. "[G]enerally not until the nineteenth century were prisons used for anything but detention of prisoners awaiting trial or execution after conviction." Wolfgang, *Criminology: Crime and Punishment in Renaissance Florence,* 81 J.Crim.L. 567, 576 (1990). In fact, New Jersey's first state prison was not opened until 1797. Frankel, *Crime Treatment in New Jersey: 1668–1934,* 28 J.Crim.L. & Criminology 90, 96 (1937). Instead, many punishments relied on shaming and public humiliation to achieve their desired effect. Jon A. Brilliant, *The Modern Day Scarlet Letter: A Critical Analysis of Modern Probation Conditions,* 1989 Duke L.J. 1357, 1360. Colonial "magistrates ... loved to enlist the community, the bystanders; their scorn, and the sinners' humiliation were part of the process." Lawrence M. Friedman, *Crime and Punishment in American History* 37 (1993); *see also* Brilliant, *supra,* at 1360–61 ("degradation figured largely in all contemporary [colonial] theories of punishment"). The shaming component was of such import that "authorities often dispensed with the punishment's physical component entirely: Many humiliated offenders were required simply to stand in public with signs cataloguing their offenses, a punishment that relied solely on mental anguish for its rehabilitative and deterrent effect [17]." Adam J. Hirsch, *From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts,* 80 Mich.L.Rev. 1179, 1225–26 (1982).

The example of this type of punishment which is most familiar today is the literary "Scarlet Letter" from Nathaniel Hawthorne's novel of the same name. The protagonist, Hester Pryne, was forced to wear a scarlet "A" on her clothing to display her conviction for adultery. Hawthorne described the impact the punishment had on the wearer:

---

**16.** *Various Items of Personal Property v. United States,* 282 U.S. 577, 581, 51 S.Ct. 282, 283, 75 L.Ed. 558 (1931); *One Lot Emerald Cut Stones and One Ring v. United States,* 409 U.S. 232, 235–36, 93 S.Ct. 489, 492–93, 34 L.Ed.2d 438 (1972); and *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).

**17.** "In Maine, in 1761, Sarah Morgan, who had the effrontery to strike her husband, was ordered 'to stand with a gagg in her Mouth halfe an houre at Kittery at a Publique Town meeting & the cause of her offence writt upon her forehead, or pay 50 s[hillings] to the County.'" *Doe,* 142 N.J. at 140, 662 A.2d 367 (Stein, J., dissenting) (citations omitted).

"But the point which drew all eyes, and, as it were, transfigured the wearer ... was that Scarlet Letter, so fantastically embroidered and illuminated upon her bosom. It had the effect of a spell, taking her out of the ordinary relations with humanity, and enclosing her in a sphere by herself." Nathaniel Hawthorne, *The Scarlet Letter* 51 (Bantam Classic ed. 1986) (1850). This literary scarlet letter was mirrored by those of real women in colonial America "humbler in its fashioning, worn less nobly, endured more despairingly, it shone a scarlet brand on the breasts of those real Hesters [18]." A. Earle, *Curious Punishments of Bygone Days* 86 (1896).

Certainly the notification provisions do not actually require registrants to wear a "Scarlet S," but the question before the Court is whether, by analogy, the provisions are the same. The purpose of requiring the offender to wear the brand or letter was to make his crime known to all citizens that he might encounter. Similarly, Megan's Law informs those likely to encounter the offender, assisted by the technological advances of photography and xerographic reproduction. Once the citizenry has been made aware of the offender's crimes, it may well be anticipated that they will greet him with ostracism and opprobrium. These colonial punishments were not without a remedial function, as they could warn individuals about dealing with a person of poor moral character. "The message was that *this* offender was not likely to mend his ways...." Friedman, *supra*, at 40.

These historical punishments typically involved the physical participation of the offender. Megan's Law notification provisions, as distinguished from registration, require no such participation by the registrant. It could be argued that this is simply a function of modern technology rather than a practical difference in effect, which is the present focus of inquiry. Colonial magistrates had no other means to identify the individual other than through public display or marking. Today, a photocopied notice can serve the same purpose with greater efficiency.

Nor should the secularization of modern society lead one to underestimate the gravity of the offenses for which the shaming punishments were meted out. In colonial society, adultery and other moral offenses were significant infractions. Shaming was also part of the punishment for offenses covered under Megan's Law such as rape [19].

The resulting impact of Megan's Law may also be analogous to another form of colonial punishment: banishment. In order to avoid the censure of the law, some registrants have left the state. (*E.g.* Alexander Artway and Carlos Diaz). This was also a function of the punishment for colonial rapists who could avoid future whippings by leaving the Province.

Due to the nature of the notice provided to the public, attention also focuses on the registrant's employer. There have been numerous instances where registrants have lost their jobs following notification. (*See, e.g.* Plaintiffs' App. at A–6–10, A–82–90, A–150) This was also a function of branding, which "... would preclude those who were branded from finding employment and thus 'render[ ] them desperate.'" Brilliant, *supra*, 1989 Duke L.J. at 1361 (quoting G. Ives, *A History of Penal Methods* 53 (1914)).

It is well documented that ostracism and opprobrium are consistently among the effects of community notification. (*See* Plain-

---

**18.** Persons convicted of theft, robbery and forgery were also required to wear scarlet letters as evidence of their crimes. Friedman, *supra*, at 75.

**19.** One rapist in colonial New Jersey was sentenced to be publicly flogged in various places throughout the community.

thou shalt be whipt this day betwixt the howers of two and three in the afternoon upon thy naked body at a Carts tayle, from the house of John Butcher in this Towne, to the house where Abraham Senior inhabitteth and from hence on the River side to the High Street, and from thence downe to the Markett house.... This sentence was repeated "every third Seventh day" for three months. For the next nineteen months thereafter, the offender was to be "brought (when thou canst be found within this Province) to each and every Quarterly Sessions at Burlington within said tyme, and then and there to be whipt in manner and forme as afore is mentioned." H. Weiss & G. Weiss, *An Introduction to Crime and Punishment in Colonial New Jersey* 58 (Past Times Press 1960).

tiffs' App. at A–1–156). They are not unanticipated results of community reaction to a known sex offender.

There are, however, critical, dispositive differences between Megan's Law and the historical shaming punishments set forth above. First, the potential ostracism and opprobrium that may result from a classification at Tier II or Tier III is not inevitable, as it was with the person whipped, pilloried or branded in public. Secondly, whether viewed subjectively or objectively, Megan's Law is not punitive in purpose. Its text (particularly as amplified by the requirements implemented under *Doe v. Poritz* ) and its legislative history (though meager) contradict any alleged historical punitive purpose. *Artway* at 1257. Megan's Law is not the product of a lust for retribution; it is a measured attempt to achieve remedial with attendant deterrent goals. The shaming punishments of colonial times were intended to and did visit society's wrath directly upon the offender; Megan's Law has different, protective purposes. Third, the shaming punishments employed contemporaneous societal reaction as an integral part of the sentence for the crime committed. Whether the impact of Megan's Law is or is not punishment, no party to the case at bar has argued (even under double jeopardy principles) that an offender is being sentenced or resentenced in classification proceedings. Those are separate proceedings involving a separate risk assessment. Even if this latter argument emphasizes form over substance, nevertheless it demonstrates a distinction between the public shaming sentences of the past and the operation of Megan's Law. Finally, the historical punishments tendered by the plaintiffs have no counterpart in the due process procedures established to tailor carefully the resulting classification and scope of notification for each Tier II or III designee. Those procedures are now part of the "text" of the law which can and does demonstrate a non-punitive "purpose" even if shaming punishments comprise a valid historical analogue. *Artway* at 1257.

Moreover, there are other historical remedial measures more comparable to Megan's Law than the stocks, public whippings and scarlet letters.

A government has always had the authority to warn the community about the presence of dangerous persons, and such warnings have never been understood as imposing unconstitutional "punishment." For example, authorities have used "wanted" posters since the earliest days of the republic, not to penalize the person depicted, but to protect the public and help apprehend that person. In addition to providing identifying information concerning fugitives from justice, the FBI's wanted posters also warn, if appropriate, that the fugitives are "extremely dangerous." *See* FBI Wanted Posters, Exh. 20. *Cf.* PA388–90˙ (sample of community notices).[20]

The FBI also uses television to attract attention to its Ten Most Wanted list, however, notification under Megan's Law is much more limited. The state is not permitted to use press releases or radio announcements in conducting community notification. (Guidelines, Exh. 19 at 15).

The law enforcement community's longstanding tradition of community notification for remedial purposes continues to this day. The Bureau of Prisons warns members of the community when prisoners escape into their midst, not only to aid in their apprehension, but also to allow citizens to protect themselves. Further, federal statutes enacted within the last 10 years require law enforcement officials to warn federal crime victims of an offender's possible parole, escape, furlough, or any other form of release. *See* 42 U.S.C. §§ 10606(b)(7), 10607(c)(3)(E) and (G), (c)(5)(A) and (B).

The State of New Jersey has similar procedures. When an offender is paroled, the public is given notice about an offender and his crime. Since 1979, the Parole Board has been required to give public notice prior to considering the release of any inmate. N.J.S.A. 30:4–123.48, 30:4–123.45. This information is provided not only to criminal justice agencies but also to "news organiza-

**20.** The analogy is not perfect, of course, since the whereabouts of a fugitive is usually unknown and that of a Tier II or III designee is disclosed in the notice; however, the protective remedial purposes are similar.

tions." (*Ibid.*) In addition, it has been New Jersey policy since 1989 to provide additional notice to county prosecutors and crime victims at the time of release from prison. *See* N.J.S.A. 52:4B–44 (statute authorizing notice to ensure the rights of crime victims).

Neither in the case at bar, nor elsewhere to this Court's knowledge, has it been argued that any of the above forms of notification impose punishment as contemplated by the double jeopardy and *ex post facto* clauses. The community notification provisions of Megan's Law resemble the above forms of notification, because it too is designed to help protect the public from persons who present a substantial risk of violence or similar dangerous behavior.

Finally, before turning to an analysis of the effects of notification and its predictable community reaction, the Court notes that *Kurth Ranch* has little relevance in the case at bar. That case, involving the alleged misuse of a tax statute for actual penal purposes, is best confined either to its specific setting or, at least, to a situation where a statute is significantly diverted from its ostensible purpose. Also, because, as developed earlier, Megan's Law is a remedial statute with at most a deterrent objective "incidental" to its "salutary purpose", it would pass muster under *Kurth Ranch*. *Artway*, 81 F.3d at 1266.

### 3. Effects

 Although, once again, *Ursery* casts considerable doubt upon whether a separate "effects" hurdle must be scaled in order for Megan's Law to withstand the present constitutional attack, *Ursery* itself suggests that both purpose and effect are considerations in an *ex post facto* or double jeopardy analysis. It is also not entirely clear whether the borrowing of *Morales* to establish an effects test for Megan's Law is consistent with *Ursery.* *See also Artway v. Attorney General of the State of New Jersey*, 83 F.3d 594, 595–98 (3d Cir.1996) (Opinion Sur Denial of Rehearing In Banc, Alito, J. dissenting). Nevertheless, because application of *Artway*'s effects test demonstrates that the classification and notification provisions of Megan's Law are constitutional, this Court does not hesitate to apply it.

A statute may also constitute punishment if the effects have a powerful enough "sting." *California Department of Corrections v. Morales*, —— U.S. ——, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). "If the negative repercussions—regardless of how they are justified—are great enough, the measure must be considered punishment." *Artway*, 81 F.3d at 1263. Whether the sting is great enough "is a matter of degree." (*Id.* at 1261 (quoting *Morales*, —— U.S. at ——, 115 S.Ct. at 1603)).

While the "effects" test may be implicit in the Supreme Court's Opinion in *Morales*, it arose in a context in which a definition of punishment was not directly at issue. The sanction in *Morales* was incarceration, and the Court focused on whether the "effect" of new legislation delaying parole hearings was to increase or extend the acknowledged punishment of incarceration. —— U.S. at —— n. 7, 115 S.Ct. at 1604 n. 7, 131 L.Ed.2d at 597 n. 7. The Court held that such an alleged effect was "speculative and attenuated" where the legislation was carefully tailored and the amendment applied "only to a class of prisoners for whom the likelihood of release on parole is quite remote." —— U.S. at ——, 115 S.Ct. at 1603, 131 L.Ed.2d at 597. In fact the *Morales* Court did not find it necessary "to discuss *Austin* and its progeny because the facts of *Morales* involved imprisonment." *Artway*, 81 F.3d at 1261.

Under such circumstances, at the very least, this Court should apply the effects test only in circumstances where, although all other considerations do not support *ex post facto* or double jeopardy arguments, the effects of subsequent legislation, if applied retroactively, would be predictably severe.

As discussed above, the only effects which should be considered under the Court's analysis are those flowing out of the legal actions of notice recipients. Specific instances of such community reaction are a matter of record in this case and have been referred to previously. As such, it is unlikely that those effects would be appreciably greater than those measures which have been found not to be punishment. *See, e.g., De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d

1109 (1960) (forbidding work as a union official to former convicts); *Hawker v. New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (revocation of a medical license); *Mahler v. Eby*, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924) (deportation); *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (termination of Social Security benefits). Even if some of the effects described in the case at bar might be considered slightly more severe than those examples, they do not demonstrate such uniform severe effects which as a matter "of degree" would constitute punishment inflicted on the plaintiffs either as a class or individually. *Artway*, 81 F.3d at 1263.

### VIII. Due Process

■ Plaintiffs also challenge Megan's Law on the grounds that the classification process fails to comport with procedural due process. No state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The initial question is whether there is a liberty interest under federal or state law which is implicated.

The Supreme Court of New Jersey found there to be a liberty interest under state law in *Doe*. *Doe*, 142 N.J. at 104–106, 662 A.2d 367. Limitations on state-created interest alone is sufficient to trigger due process. *Hewitt v. Helms*, 459 U.S. 460, 469–72, 103 S.Ct. 864, 870–72, 74 L.Ed.2d 675 (1983).

■ The *Doe* Court also recognized a federally-protected liberty interest implicated by Megan's Law and this Court agrees. *Doe*, 142 N.J. at 100–104, 662 A.2d 367. "[R]eputation alone, apart from some more tangible interests such as employment, is [not] either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). Instead, the action must alter " 'a right or status previously recognized by state law,' for it is that 'alteration, officially removing the interest from the recognition previously afforded by the State,

which [the Court has] found sufficient to invoke the procedural guarantees contained in the Due Process clause of the Fourteenth Amendment.' " *Doe*, 142 N.J. at 102, 662 A.2d 367 (quoting *Paul*, 424 U.S. at 711, 96 S.Ct. at 1165).

*Paul* has been interpreted to require "stigma plus" some other impediment to involve a liberty interest. *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir.1994); *see also Sturm v. Clark*, 835 F.2d 1009, 1012 (3d Cir.1987); *Borucki v. Ryan*, 827 F.2d 836, 842–43 (1st Cir.1987). The *Doe* Court found the "harm to plaintiff's reputation, when coupled with the incursion on his right to privacy ... constitutes a protectible interest." *Doe*, 142 N.J. at 103, 662 A.2d 367. Such a result may also be reached by coupling the reputational damage with the loss of employment opportunities [21] or, more directly, the continuing legal status as a registrant and the duties imposed as a result.

■ Once a liberty interest has been discerned, the degree of process required is flexible and dependent upon the circumstances of a given case. *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 983–84, 108 L.Ed.2d 100 (1990); *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). There must be sufficient notice and a meaningful opportunity to be heard. *U.S. v. Raffoul*, 826 F.2d 218, 222 (3d Cir.1987); *Kahn v. U.S.*, 753 F.2d 1208, 1218 (3d Cir.1985).

### A. Notice

■ In fashioning its modifications to Megan's Law, the *Doe* court stated that "in some cases it may be impossible as a practical matter to give such notice, or to give it timely, and in those cases it may be dispensed with." Under the Attorney General's Guidelines, notice may be dispensed with when the "Prosecutor's Office does not receive notification of the release of a person determined to be a Tier III offender until after the date of release ... for example, when an offender who has been civilly com-

---

21. *See, e.g. Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 602 (3d Cir.1979), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980) (loss of clients was cognizable under the Due Process Clause).

mitted is released on short notice by a judge." (Guidelines For Law Enforcement for Notification to Local Officials and/or the Community of the Entry of a Sex Offender Into the Community A–327). The prosecutor must still seek judicial approval of notification without notice prior to its dissemination. (*Id.*)

Although the exigency presented in some cases may be questionable, this guideline, as a general proposition, does not offend the notice requirement. In the vast majority of cases, timely notice is provided to the registrant prior to notification. (*Id.; see also, e.g.* Plaintiffs' App. at A–158, A–162, A–188, A–194).

### B. Hearing

■ The judicial hearing itself will now be evaluated. Four factors must be considered in analyzing the procedure: (1) the importance of the private interest; (2) the length or finality of the deprivation; (3) the risk of government error; and (4) the magnitude of the government interest involved. *Mathews,* 424 U.S. at 334–35, 96 S.Ct. at 902–03. As has already been discussed above, there is an important private interest implicated here. The deprivation is for a minimum of 15 years to life. There is also a public interest of great magnitude, the threat posed by sex offenders in the community. It is the application of the third prong of *Mathews* which requires greater scrutiny. Upon a complete review of this issue, the Court determines that the risk of government error under the current statutory and regulatory scheme is not so high that it denies due process to a sex offender subject to classification/notification proceedings.

The Supreme Court of New Jersey has laid out a comprehensive scheme for judicial review of Tier level determinations and method of notification. The Court determined that any person covered by the law can seek judicial review of a Tier II or Tier III classification and the manner of notification prior to actual notification. Under Megan's Law, pursuant to the court's decision:

(1) except in exigent circumstances, offenders subject to notification will receive written notice at least two weeks in advance, detailing the proposed Tier level and the specific manner proposed for notification;

(2) the offender has the right to object to notification by filing a simple application with the court in his own county;

(3) the offender is entitled to an automatic stay of notification if he files a timely objection;

(4) the offender has the right to be represented by retained counsel, or, if he cannot afford it, to have free counsel appointed by the court;

(5) the court must immediately set a date for a pre-notification court hearing;

(6) the offender must receive extensive pre-hearing discovery of "all papers, documents, and other materials, including the prosecutor's findings and statement of reasons for the level and manner of the proposed notification;"

(7) the offender must receive a hearing before a neutral fact-finder, a state trial court judge;

(8) the offender's privacy is protected because the hearing must be *in camera;*

(9) at the hearing, the State must present evidence establishing a *prima facie* case justifying the proposed Tier level and manner of notification;

(10) the offender then has the opportunity to rebut the State's *prima facie* case, which he must do by a preponderance of the evidence;

(11) the rules of evidence do not apply at the court hearing;

(12) notification cannot occur unless it is approved or meets the requirements set by the court; and

(13) if the court allows notification, the offender may seek to stay notification "to allow time for application to an appellate court."

*Doe v. Poritz,* 142 N.J. at 30–35, 662 A.2d 367.

### 1. Registrant Risk Assessment Scale

The Attorney General has designed a Registrant Risk Assessment Scale ("RRAS") to be utilized by the county prosecutors in de-

termining the appropriate Tier level for a given registrant. A blank copy of the RRAS is annexed hereto as Exhibit A. The RRAS has four categories: seriousness of offense, offense history, characteristics of offender and community support, with 13 individual indices within them. Due to the weighting of factors, past conduct can result in 90 of the maximum 111 points in the scale. *Artway*, 81 F.3d at 1266 n. 30. The prosecutor enters the information about the offender in the scale and generates a numerical score. Based upon the score, the registrant will fall into one of the Tier ranges.

The Supreme Court of New Jersey has described the central inquiry of "risk of re-offense" in *Doe*.

> The only issue for the court on the Tier level of notification is the risk of reoffense. In that sense the factors of the Guidelines noting the characteristics of the prior offenses or the offender are relevant only to the risk of re-offense, *i.e.*, the likelihood of its occurrence. That is the clear intent of the statute.

*Doe*, 142 N.J. at 32–33, 662 A.2d 367. Plaintiffs argue that the RRAS, through its weighting of the indices, compels the "risk" to be defined by the severity of the registrant's *past* acts; therefore, if the nature of the acts previously committed is extensive enough, the RRAS may tier the registrant beyond his actual risk of re-offense. Plaintiffs, however, misconceive the "risk of reoffense" inquiry. The New Jersey Legislature has determined that all sex offenders have a likelihood of recidivism sufficiently significant to warrant the enactment of Megan's Law.[22] The inquiry is not directed to the actual probability of re-offense but rather to a calculation of *relative* or *comparative* risk of re-offense from which results a determination of either "low" (Tier I), "moderate" (Tier II), or "high" (Tier III) risk for a particular offender. *Doe* makes this clear distinction.

> All offenders required to register are, by statute, subject to at least Tier One notification, meaning that no matter how low

the risk of reoffense, the Legislature has concluded Tier One notification is required.

> \* \* \* \* \* \*

> We note further that quite obviously none of these standards or classes suggests the court must make a finding of likelihood of reoffense, for the Legislature did not impose either Tier Two or Tier Three notification only when it was probable that reoffense would occur, but rather only when the risk—however quantified— was sufficient to warrant such notification. The quality of the offense—a sex offense— undoubtedly led to this legislative conclusion that notification was warranted even when reoffense was not probable, and that legislative conclusion is unassailable in any proceedings before the court. Therefore the probability of reoffense on the part of moderate or high-risk offenders is not the issue before the court, but rather the relatively greater risk of reoffense compared either to the low-risk offender class or the moderate-risk offender class.

(*Id.* at 34, 662 A.2d 367). With this understanding of the nature of classification proceedings and the role therein played by the RRAS, it cannot be said that there is such a "risk of error" in determining an offender's relative risk of re-offense as to deprive him of procedural due process. *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). Indeed the scheme established for classification proceedings under Megan's law is comparable to that found adequate in *Mathews*.

Plaintiffs also argue that a failure to provide for reduction of the RRAS score for indicia of successful rehabilitation exacerbates the overstatement of the risk of reoffense. Where the relevant inquiry is one of relativity, however, this argument is not persuasive. It also assumes a right to have the thresholds for moderate and high risk remain at 37 and 74 respectively even if the requested deduction were put in place. No offender has such a right; certainly not one that implicates constitutional considerations. Those thresholds could reasonably be low-

---

**22.** *Statistical and other empirical evidence regarding recidivism rates for sex offenders varies widely. There is support for nearly every point*

*of view. It is not this Court's duty, however, to question the Legislature's choice of support for its conclusions.*

ered if the deductions which plaintiffs espouse were allowed. Finally, several aspects of rehabilitation are addressed in the RRAS, and if those findings are favorable to the offender his score is not increased as it would be were that not the case.

### 2. Proceedings Before the State Court

The proceedings resulting in classification of a sex offender at Tier I, II or III are not criminal. No valid argument can be made, for example, that the registrant has a right to a jury trial in the review of the county prosecutor's classification decision. Furthermore, even though civil in nature, no jury trial right in that realm exists for such a proceeding. The legislative/regulative pattern that has emerged in the wake of *Doe v. Poritz* is practically *sui generis*.[23] It is most analogous to an administrative proceeding encompassing judicial review. Under such circumstances, particularly since the consequences of classification are not punishment as such (*supra*), due process protections are not as extensive as those required in a plenary criminal or civil trial. *See Mathews v. Eldridge, supra,* approving a procedure entailing a hearing after an initial adverse administrative determination. If the format adopted by the State of New Jersey provides at least the minimum due process required in such classification proceedings this Court must sustain it, even if greater safeguards for the rights of a registrant might have been adopted. Stated otherwise, this Court is not here to analyze the wisdom of the State's chosen procedures, only their constitutionality. The format established by the State of New Jersey, in a joint effort of its legislative, executive and judicial branches, provides due process to the registrant. After receiving notice of the prosecutor's classification, the offender has the right to be heard promptly before a specially assigned judge of the Superior Court, Law Division. While the scope of state judicial review has limitations, the rules of evidence do not apply (to evidence presented by either party), and the registrant must prove by a preponderance of the evidence that his Tier classification is erroneous. These rules are well within the boundaries of due process requirements for such proceedings. One must also keep in mind that the most critical element of a registrant's classification: his prior conviction(s), has already been proven either by his own admission of guilt or at a trial in which the State of New Jersey bore the burden of proof beyond a reasonable doubt.

Furthermore, even though the RRAS heavily weights the nature of the registrant's past offense(s), this is not violative of constitutional due process. *Supra.* This scale represents a permissible state choice. More particularly, although the prior offenses are heavily weighted, a high "score" is required to place a registrant at Tier III. The statistics presented to this Court show that only about 5% of registrants subjected to Tier classification have been classified at Tier III where the greatest potential threat to the registrant's liberty interest is present. This does not demonstrate a grossly excessive weight accorded to past offenses on the RRAS scale.[24]

The record before this Court also demonstrates that in a significant number of proceedings brought before the Superior Court, the Tier classification derived by the county prosecutor has been reduced by the reviewing judge. This is but further evidence that due process is being afforded to persons subject to Megan's Law.

■ Plaintiffs also attack the obligation that an offender must overcome the prosecutor's *prima facie* case by a preponderance of the evidence. It is neither unusual nor impermissible to assign the burden of proof to a party who initiates a court proceeding to

---

23. The *Doe* Court described the Superior Court's review as a "summary proceeding" (*Doe,* at 30–31, 662 A.2d 367) although the procedures described in *Doe* and later implemented do not mirror those of N.J.R. 4:67–1 *et seq.*

24. The Court has also been advised that there are classification cases presently before the Supreme Court of New Jersey directly challenging this feature of the RRAS. Without either abdicating its responsibility here or invoking any formal doctrine of abstention, this Court notes that the Supreme Court of New Jersey is a very appropriate forum in which that issue can and should be addressed. These developments further demonstrate that Megan's Law is affording procedural due process to members of the plaintiff class.

overrule or modify the decisions or actions of another. Stated otherwise, the offender who initiates a proceeding before the Superior Court for review of his Tier classification is not unlike a plaintiff in a civil action, one who traditionally bears the burden of proof by a preponderance of the evidence. Furthermore, under Megan's Law, the prosecutor must establish a *prima facie* case before the offender is required to go forward. Although both appropriate and understandable in such a situation, this requirement placed upon the prosecutor affords to the offender a procedural benefit not enjoyed by a traditional civil plaintiff. At the very least, the scheme established by the *Doe* Court is within the "flexible" boundaries of procedural due process recognized in *Mathews*.

Other court decisions demonstrate the adequacy of Megan's Law hearings. In *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Court set forth the basic requirements for a state parole revocation hearing. There was no express allocation of the burden of proof; however, the Court stated, "The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation." (*Id.* at 488, 92 S.Ct. at 2603). This language suggests that there is at least a burden of production assigned to a parolee in such a hearing. In addition, the Supreme Court added, "It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." (*Id.* at 489, 92 S.Ct. at 2604). If a hearing of this nature satisfies fourteenth amendment due process requirements for a parolee faced with a return to jail, the proceedings under Megan's Law are adequate for a person facing less drastic consequences. *See also Kahn v. United States*, 753 F.2d 1208 (3d Cir.1985), acknowledging and applying the *Mathews* tests in upholding against a fifth amendment due process attack certain provisions in the Internal Revenue Code providing for payment of 15% of an assessed penalty prior to any administrative hearing.

For the reasons set forth immediately above, the Court determines that defendants are entitled to summary judgment dismissing plaintiffs' claims that the Tier classification procedures of Megan's law violate the fourteenth amendment's Due Process Clause.

### CONCLUSION

The Court has addressed above the facts of record and legal principles which it has determined are material to the adjudication of the pending summary judgment motions. Several other arguments have been presented to the Court in the numerous briefs, exhibits, affidavits and oral arguments in this matter. Any not addressed expressly herein have nevertheless been fully considered.

Additionally, in re-examining the foregoing Opinion, this Court concludes that although *Ursery* affected the approach employed in analyzing Megan's Law, the result in this case would be the same even under the more rigid formula of *Artway* that requires one to leap over the hurdles which that Opinion erects on the track to the finish line. This Court presents this clarification because it may be of some importance to a reviewing court.

Summary judgment is entered for the defendants upon each Count of the plaintiff class's Second Amended Complaint. Those claims are dismissed with prejudice. Plaintiffs' motions for summary judgment are denied. Because the plaintiffs have been represented by the Office of the Public Defender, no taxable costs will be imposed; all parties are to bear their own. At oral argument, plaintiffs' counsel requested a stay of this Court's decision, should it be adverse to his clients. That application is denied; however, pursuant to 28 U.S.C. § 1651 and its inherent powers, this Court extends its preliminary injunction herein, in all respects, to 12:00 noon, July 9, 1996, in order to afford to the plaintiff class the opportunity to initiate an appeal and seek interim relief before the United States Court of Appeals for the Third Circuit. Finally, when that preliminary injunction expires, the security posted by the plaintiffs pursuant to Fed.R.Civ.P. 65(c) will be returned. Despite this Court's ultimate decision in fa-

vor of the defendants, it could not conceivably be argued that they were "wrongfully enjoined or restrained" by the preliminary injunction. (*Id.*) That injunction was properly granted and continued; indeed it was essential to the preservation of the status quo and the rights of all parties pending final adjudication of the many issues in this action. An Order reflecting the foregoing decisions accompanies this Opinion.

## ORDER

For the reasons set forth in the Court' Opinion filed herewith,

It is on this 1st day of July, 1996, **ORDERED** that:

1. Defendants' motion for summary judgment upon each Count of plaintiffs' Second Amended Complaint be and it hereby is granted, and plaintiffs' Second Amended Complaint be and it hereby is dismissed, with prejudice;

2. Plaintiffs' motions for summary judgment be and they hereby are denied;

3. This matter is hereby dismissed without imposition of taxable costs; all parties are to bear their own;

4. Plaintiffs, application for a stay of this decision be and it hereby is denied;

5. The preliminary injunction previously entered herein, as set forth in this Court's Order of January 26, 1996 and extended by subsequent Orders, be and it hereby is extended to 12:00 noon, July 9, 1996; and

6. Upon the expiration of said preliminary injunction, all security posted with this Court pursuant to Fed.R.Civ.P. 65(c) shall forthwith be returned to the plaintiffs.