No. 74,078

STATE OF KANSAS, *Appellee*, v. KYM E. MYERS, *Appellant*.

(923 P.2d 1024)

Opinion filed August 23, 1996.

*Rick Kittel,* assistant appellate defender, argued the cause, and *Stephen C. Moss,* assistant appellate defender and *Jessica R. Kunen,* chief appellate defender, were on the brief for appellant.

*Kelly A. Feyh,* assistant attorney general, argued the cause, and *Carla J. Stovall,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This difficult case resolves the claim of defendant Kym Myers that the Kansas Sex Offender Registration Act (KSORA),

K.S.A. 22-4901 *et seq.*, as applied to him, violates the Ex Post Facto Clause of the United States Constitution. The determinative issue is whether KSORA constitutionally may be applied to Myers, whose offense was committed before April 14, 1994, the date KSORA took effect.

Myers was convicted in 1991 of one count of sexual battery, K.S.A. 21-3517 (Ensley 1988) and one count of rape, K.S.A. 21-3502 (Ensley 1988). The Court of Appeals reversed his convictions and remanded the case for a new trial in an unpublished opinion filed September 3, 1993. We affirmed the Court of Appeals. See *State v. Myers,* 255 Kan. 3, 872 P.2d 236 (1994). After remand, Myers pleaded no contest on August 15, 1994, to the aggravated sexual battery (K.S.A. 21-3518 [Ensley 1988]) of his 17-year-old victim, who was assisting her mother in cleaning Myers' law office. Myers was ordered to be processed under KSORA as a "sex offender." A KSORA sex offender is any person convicted of a named offense on or after July 1, 1993. Aggravated sexual battery is a named offense. K.S.A. 22-4902(a), (b)(9), and K.S.A. 22-4910. We note that if Myers' 1991 convictions had been affirmed, he would not be subject to KSORA classification as a sex offender. After his plea in 1994, Myers filed a motion to eliminate the requirement of KSORA registration. He challenged the constitutionality of KSORA as ex post facto legislation violating Art. I, § 10 of the United States Constitution. Myers' motion was denied, and he appealed. Our jurisdiction is under K.S.A. 20-3017. (We granted Myers' motion to transfer to this court.)

We deny Myers' ex post facto claim as to registration. The registration requirements of KSORA (K.S.A. 22-4904, K.S.A. 22-4906, and K.S.A. 22-4907) are remedial and thus constitutional. As applied to Myers, the public disclosure provision, K.S.A. 22-4909, imposes punishment in violation of the Ex Post Facto Clause. Myers is required to register under KSORA. However, his registration shall not be open to public inspection and shall not be subject to the provisions of the Kansas Open Records Act, K.S.A. 45-215 *et seq.*

Myers asserts, for the first time on appeal, two additional constitutional issues that were not argued before the district court, *i.e.*,

KSORA (1) constitutes cruel and unusual punishment and (2) violates due process guarantees. We do not reach these additional issues.

## FACTS

Myers was sentenced to 2 to 5 years after his August 1994 no contest plea. He was given credit for time served in prison and was placed on probation for 1 year. Myers had no prior convictions. The district court ruled, over Myers' objection, that KSORA applied.

Myers raised the ex post facto issue in his pro se brief supporting his motion to modify probation conditions to eliminate registration under KSORA:

"The defendant did thereafter register at the Johnson County Sheriff's Office. Since that time the Defendant's name and address have appeared both on television and in local newspapers naming him as a convicted sex offender. As a result of this the Defendant has been evicted from a rental unit occupied by his family, and is currently on the verge of being evicted and forced to leave his current residence."

## The Record Below

At the hearing in the district court, both sides agreed that Myers' motion to eliminate the requirement to comply with KSORA presented a question of law and could be handled by oral argument. The judge responded: "Well, to me if we can handle it by argument and proffers through oral statement, unless you all have some evidence that you want to present on the other side. . . ." After Myers' attorney advanced the ex post facto argument and presented Myers' pro se brief on that issue, Myers requested permission to address the court. The judge admonished him: "Well, Mr. Myers, I'll allow you to speak. Reserve it to whatever legal matter in rebuttal that you might wish to make and that in addition to your brief." Despite the admonishment, during his argument, Myers described his life as a registered sex offender:

"Now, [registration] has caused me more problems than going to prison. I was evicted from my mother's apartment; left me virtually homeless. I had nowhere to go. I didn't have anyone to rent to me. I didn't know what to do. I had to go

to a halfway house. I've been on television. I've been in—Overland Park publishes this every Friday.

"I can't live like this and every morning I get up to look at the paper—I'm paranoid. I can't take this. I'm about ready to crack, okay? I live with 12 other guys. They are about ready to kick me out on the street. I have no money. I don't know what I'm going to do. At least in prison I knew I had a place to sleep. I would rather go back to prison. I can't do this."

Myers' statements, which were not under oath, went beyond the restrictions that the judge imposed. The State neither objected to nor disputed the statements. The State did not request that Myers testify under oath. Both sides had agreed, and the judge specifically mentioned, that oral proffers could be made.

Although Myers did not specifically designate his statements concerning his housing difficulties as a proffer, under the circumstances, we view them as such. Myers' statements about the consequences he suffered because of registration provide a sufficient record to consider the ex post facto issue.

## DISCUSSION

The State asserts that KSORA is not an ex post facto law because it is neither punitive in nature or effect. According to the State, KSORA is a regulatory statute designed for the legitimate governmental goals of public safety and law enforcement assistance. The State claims that any stigma or ostracism faced by Myers in his personal or professional life is due not to registration and disclosure, but to his underlying conviction as a sex offender.

### The Federal Statute

42 U.S.C. § 14071 (1994), the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program Act (the Act), was enacted as part of the federal Violent Crime Control and Law Enforcement Act of 1994. The Act encourages states to implement registration programs for sex offenders against children in order for the state to be eligible for certain federal funds for drug control. However, the Act does not require that states apply their sex-offender registration laws retroactively. The Act was amended May 17, 1996 (to be cited as Megan's Law), authorizing disclosure for any purpose permitted under state law. A law en-

forcement agency "shall release relevant information that is necessary to protect the public concerning a specific person required to register." Pub. L. No. 104-145, 110 Stat. 1345 (1996).

### Sex Offender Registration Laws in Other States

A review of the laws of other states concerning sex offenders and their public disclosure provisions, if any, is helpful in considering the constitutionality of KSORA as applied to Myers. All 50 states have enacted sex offender registration laws of varying scope. For a listing of 50 states and their sex offender registration laws see *People v. Ross*, 169 Misc. 2d 308, 646 N.Y.S.2d 249 (N.Y. Sup. 1996).

Although the laws in a heavy majority of the states still require that the registry information be kept confidential and made available for use only by law enforcement agencies, some of the more recently enacted registration laws (such as in Iowa, North Carolina, and Vermont) show a trend toward limited public disclosure. For example, the Iowa and North Carolina statutes allow disclosure of registry information for a specifically requested name to the person making the request. Iowa Code Ann. § 692A.13(6) (West 1996 Supp.); N.C. Gen Stat. § 14-208.10(a) (1995 Supp.). In Vermont, when the newly enacted statute becomes effective on September 1, 1996, certain authorized employers can request registry information when necessary to protect the public. 1996 Vt. Laws P.A. 124, § 1 (to be codified at Vt. Stat. Ann. tit. 13, § 5402 [3]).

Many registration laws apply to persons committing sex offenses before the effective dates of the laws. See, *e.g.*, Mich. Comp. Laws Ann. § 28.723 (West 1996 Supp.) (sex offenders convicted after October 1, 1995, or convicted on or before that date but on probation or parole or in jail on that date required to register).

In a few states, such as New Jersey and New York, the laws provide for community notification concerning certain registered sex offenders, depending on the risk level of the offender. See N.J. Stat. Ann. §§ 2C: 7-6, 7-8 (West 1995); N.Y. Correct. Law § 168-l(6) (McKinney 1996 Supp.). The New Jersey provisions apply to persons committing certain sex offenses whose conduct is characterized by compulsive, repetitive behavior, regardless of when the offenses were committed. N.J. Stat. Ann. § 2C: 7-2(b)(1) (West

1995). See *Opinion of the Justices to the Senate*, 423 Mass. 1201, 668 N.E.2d 738 (1996), in which the Supreme Judicial Court of Massachusetts answered questions concerning the constitutionality of pending S.B. 2276 proposing a sex offender community notification law modeled after New Jersey's.

In Pennsylvania, the newly enacted community notification provisions expressly apply only to persons committing sex offenses after the effective date of the law, thus avoiding an ex post facto challenge. 42 Pa. Cons. Stat. Ann. § 9793 (1996 Supp.).

Myers points out that, besides the Kansas statute, only the Georgia and South Dakota statutes allow unrestricted public access to registrant information and South Dakota does not permit publication of the information. Ga. Code Ann. §§ 42-9-44.1(e) (1994); S.D. Codified Laws Ann. § 1-27-1 (1996 Supp.); and S.D. Codified Laws Ann. § 22-22-40 (1996 Supp.). Also, Georgia's statute applies only to child sex offenders, Ga. Code Ann. § 42-9-44.1(a) (1994), and South Dakota limits the offender's duty to register to fewer crimes than does Kansas. S.D. Codified Laws Ann. § 22-22-30 (1996 Supp.). Myers contends he would not have been required to register under either the Georgia or South Dakota acts.

We observe that Illinois has enacted a child sex offender community notification law which became effective June 1, 1996. Ill. Comp. Stat. Ann. ch. 730, 152/101 *et seq.* (Smith-Hurd 1996 Supp.). That law provides for retroactive application, limited community notification, and public access to registry information on child sex offenders. Ill. Comp. Stat. Ann. ch. 730, 152/125(c) (Smith-Hurd 1996 Supp.).

Myers suggests that KSORA's disclosure provision is the broadest in the country. The State characterizes KSORA, which allows public access as opposed to mandating dissemination of such information, as being in the "middle" regarding disclosure. We have found no other state's disclosure statute to be broader than KSORA's.

The Ex Post Facto Clause of the United States Constitution

Myers contends that KSORA is criminal in nature because it is punitive in both purpose and effect. Because KSORA is punitive,

Myers reasons, its application to him is ex post facto and unconstitutional. Myers' offense occurred before April 14, 1994, the date KSORA took effect. See L. 1994, ch. 107, § 10.

The constitutionality of a statute is a question of law; thus, we exercise an unlimited, de novo standard of review. See *State v. Mertz*, 258 Kan. 745, 748, 907 P.2d 847 (1995).

We are mindful of the frequently stated rules applied when a statute is questioned as unconstitutional:

"The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt." *State v. Bryan*, 259 Kan. 143, Syl. ¶ 1, 910 P.2d 212 (1996).

Our focus is upon the application of KSORA to Myers' factual situation. Article I, Section 10, of the United States Constitution provides: "No State shall . . . . pass any . . . ex post facto Law."

The Ex Post Facto Clause encompasses:

"1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime*, or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender*." *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L. Ed. 648 (1798).

The *Calder* categories were rephrased in *Beazell v. Ohio*, 269 U.S. 167, 169-70, 70 L. Ed. 216, 46 S. Ct. 68 (1925):

"[A]ny statute which punishes as a crime an act previously committed, which was innocent when done, *which makes more burdensome the punishment for a crime, after its commission*, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*." (Emphasis added.)

In *Collins v. Youngblood*, 497 U.S. 37, 50, 111 L. Ed. 2d 30, 110 S. Ct. 2715 (1990), the Court re-adopted the *Calder* categories, as rephrased in *Beazell*. *Kring v. Missouri*, 107 U.S. 221, 228-29, 27

L. Ed. 506, 2 S. Ct. 443 (1882), was overruled to the extent *Kring* had broadened those categories to include any change which "alters the situation of a party to his disadvantage." Our analysis in Myers' case concerns whether KSORA "makes more burdensome the punishment for a crime, after its commission." Ex post facto laws are particularly objectionable because they deprive their object of all notice. See, *e.g., Miller v. Florida*, 482 U.S. 423, 429-30, 96 L. Ed. 2d 351, 107 S. Ct. 2446 (1987); *Weaver v. Graham*, 450 U.S. 24, 30, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981).

"These [including the Ex Post Facto Clause] are towering constitutional provisions of great importance to individual dignity, freedom, and liberty." *John Doe v. Poritz*, 142 N.J. 1, 43, 662 A.2d 367 (1995).

"James Madison emphasized their fundamental role in our Constitution:
  'Bills of attainer, ex post facto laws, and laws impairing the obligations of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former are expressly prohibited by the declarations prefixed to some of the State Constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us nevertheless, that additional fences against these dangers ought not to be omitted. Very properly therefore have the Convention added this constitutional bulwark in favor of personal security and private rights.'
  [The Federalist No. 44, at 301 (James Madison) (Jacob E. Cooke ed., 1961).]" 142 N.J. at 113 (Stein, J., dissenting).

The constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them. *Collins*, 497 U.S. at 41. In *State v. Nunn*, 244 Kan. 207, 219, 768 P.2d 268 (1989), we applied the following two-step analysis prescribed in *Graham*, 450 U.S. at 29, for determining whether a statute is an ex post facto law: " 'For a criminal or penal law to be ex post facto, two elements must be present: the law "must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." [Citations omitted.]' "

*The State concedes that the statute applies retroactively to Myers.* Thus, we concentrate on the penal element of the ex post facto

test as modified by *Collins*: Does KSORA impose punishment on Myers?

The Court in *De Veau v. Braisted*, 363 U.S. 144, 160, 4 L. Ed. 2d 1109, 80 S. Ct. 1146 (1960), held that a statute barring certain unions on the New York waterfront from collecting dues if any union officers or agents were ex-felons was not an ex post facto law, reasoning:

"The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation . . . ."

If the legislative intent of the statute is to punish, then the inquiry is ended. See *Trop v. Dulles*, 356 U.S. 86, 95-96, 2 L. Ed. 2d 630, 78 S. Ct. 590 (1958) (statute revoking citizenship for military desertion held invalid as cruel and unusual punishment).

We turn now to an examination of legislative intent.

### Legislative Intent

The State concedes that KSORA contains no express statement of legislative intent or purpose. However, both parties have cited legislative history. Myers argues that the legislative history shows punitive intent. The State counters that the intent is regulatory. We agree with the State.

The Habitual Sex Offender Registration Act was first enacted in 1993 as K.S.A. 1993 Supp. 22-4901 *et seq*. L. 1993, ch. 253, § 17. It was amended in 1994 and renamed the "Sex Offender Registration Act" (KSORA). L. 1994, ch. 107, § 1. The 1993 version applied to "habitual sex offenders," defined at K.S.A. 1993 Supp. 22-4902(a) as those convicted a "second or subsequent time" after the effective date of the act for a sexually violent crime. Myers, who had no previous conviction, would not be a sex offender required to register under the 1993 act.

K.S.A. 1993 Supp. 22-4909 provided:

"The statements or any other information required by this act shall *not be open to inspection by the public* and specifically are *not* subject to the provisions of the Kansas open records act, K.S.A. 45-215 *et seq*., and amendments thereto, nor may

this data be obtained by any person other than a law *enforcement officer* or other individual as may be *authorized specifically by law*. (Emphasis added.)

KSORA defined "sex offender" as anyone convicted of a sexually violent crime after the effective date of the act. K.S.A. 22-4902(a). Although K.S.A. 22-4910 states that July 1, 1993, is the effective date, L. 1994, ch. 107, § 10 provides: "This act shall take effect and be in force from and after its publication in the Kansas register." KSORA was published in the Kansas Register on April 14, 1994.

The offender is required to register within 15 days of coming into any county of residence or where temporarily domiciled more than 15 days. K.S.A. 22-4904. The offender is required to register for 10 years from the first conviction or release from confinement, and upon a second or subsequent conviction, for life. K.S.A. 22-4906. *The most significant change was the elimination of confidentiality of the information required with registration.*

K.S.A. 22-4909 provides:

"The statements or any other information required by this act shall be open to inspection in the sheriff's office by the public and specifically are subject to the provisions of the Kansas open records act, K.S.A. 45-215 *et seq.*, and amendments thereto."

KSORA was passed in the wake of public outcry following the tragic July 1993 murder of Stephanie Schmidt by Donald Ray Gideon, a co-worker who had prior convictions for rape and aggravated sodomy. See *State v. Gideon*, 257 Kan. 591, 595-96, 614, 894 P.2d 850 (1995).

After the murder, Stephanie's parents helped form an ad hoc task force which proposed legislation concerning sex offenders, including H.B. 2661 (which became KSORA). Several people from the task force testified before the House Committee on Judiciary in favor of H.B. 2661, as did the Attorney General. Excerpts from the Minutes of the House Committee on Judiciary for January 26, 1994 show that the overriding concern behind H.B. 2661 was promotion of public safety with public access to information on the criminal history of released sex offenders.

"Our final work product is for Stephanie, but more importantly our work and the work of others will hopefully prevent future tragedies. . . .

. . . .

"These bills will make more information available to the public in order to help protect them from a class of criminal which is very likely to repeat and repeat its crimes." Statement of Representative Gary Haulmark.

"It is up to you to take bold steps forward in the prevention and awareness required to save lives: lives like Stephanie's . . . lives like your children's and . . . lives of your families and the lives of all Kansans.

. . . .

"Stephanie's death was the second offense of her rapist/murderer. Now that she has been killed, the law says her assailant should register. Had he been registered in the first place, Stephanie might be alive today. . . .

. . . .

"The two bills before you will make a difference. [The second bill, H.B. 2660, would have required probation officers to notify employers by mail if they have hired a sexually violent felon. H.B. 2660 was not enacted.] They will allow the living to take precautionary steps: to make decisions that would save their lives." Statement of Stephanie's mother, Peggy Schmidt.

"I would encourage you to pass these bills [H.B. 2660 and 2661] and to step forward boldly and proudly. Make these protective steps to help the public through awareness of any sex offender's release; protective steps to promote the rights of employers to know who they are hiring, and protective steps that would hold the rights of public safety over and above the rights of convicted felons, murderers, and rapists." Statement of Stephanie's father, Gene Schmidt.

"Another problem with the current law is that the registration information is only open to law enforcement agencies, not the community. For it to be available to the public is an invasion of the criminals' right to privacy. But isn't it an invasion of rights when those criminals turn around and rape or murder innocent individuals?" Statement of Stephanie's sister, Jeni Schmidt.

"The current law requires sex offenders to register only after the second offense. Countless studies have shown that more often than not a sex offender's 'first' offense is actually just the first time he or she has been caught. Why give them yet another opportunity to cause more damage and destroy more lives?

"The registration information needs to be open to the public, not just to law enforcement agencies as it is under the current law. The purpose of the registration is to protect the public, but how can we do that if the public doesn't have the right to know when a convicted offender is residing in their community—in fact may be their next door neighbor, or someone they work with?" Statement of Robert T. Stephan, Attorney General.

The Senate Committee on Judiciary also held hearings on H.B. 2661. Statements similar to those made before the House Com-

mittee on Judiciary were presented. Minutes of Senate Committee on Judiciary, March 21, 1994.

A representative of the American Civil Liberties Union expressed constitutional concerns in opposing H.B. 2661 and H.B. 2660.

We conclude that the legislative history suggests a nonpunitive purpose—public safety. However, our analysis does not end with our "public safety" conclusion. Even when the legislative intent behind the statute is nonpunitive, we should ask whether the "statutory scheme was so punitive either in purpose or effect as to negate that intention." *United States v. Ward*, 448 U.S. 242, 248-49, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980). " '[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground.' " 448 U.S. at 249 (quoting *Flemming v. Nestor*, 363 U.S. 603, 617, 4 L. Ed. 2d 1435, 80 S. Ct. 1367 [1960]). The legislation must be examined to determine if, in Myers' situation, KSORA has a punitive effect sufficient to negate the nonpunitive purpose.

## The Punitive/Nonpunitive Effect Review

In many cases involving ex post facto challenges to sex offender registration statutes, courts have applied the factors enumerated in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 9 L. Ed. 2d 644, 83 S. Ct. 554 (1963), to determine whether the statute's effect is punitive. *Mendoza-Martinez* held that divesting American citizenship for draft evasion or military desertion was "punishment" and the procedural protections of the Fifth and Sixth Amendments applied. 372 U.S. at 167. The factors are:

"[1] [w]hether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as punishment, [3] whether it comes into play only on a finding of *scienter*, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned . . . ." 372 U.S. at 168-69.

See *Doe v. Pataki*, 919 F. Supp. 691, 700 (S.D.N.Y. 1996); *Rowe v. Burton*, 884 F. Supp. 1372, 1378 (D. Alaska 1994); *State v.*

*Noble*, 171 Ariz. 171, 175, 829 P.2d 1217 (1992); *State v. Manning*, 532 N.W.2d 244, 247 (Minn. App. 1995); *State v. Ward*, 123 Wash. 2d 488, 499, 869 P.2d 1062 (1994). Courts have applied the *Mendoza-Martinez* factors when the legislature has not indicated whether the statute is intended to be punitive or regulatory, *Manning*, 532 N.W.2d at 247, or when conclusive evidence of legislative intent is unavailable. *Ward*, 123 Wash. 2d at 500. The *Mendoza-Martinez* factors have been applied even when the statutory design was found to display a purpose to regulate and not to punish. *Burton*, 884 F. Supp. at 1377-78.

Other courts, in considering ex post facto challenges to sex offender registration statutes, have rejected the *Mendoza-Martinez* factor analysis. See *Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1262, *reh. denied* 83 F.3d 594 (3d Cir. 1996):

"Nevertheless, like the New Jersey Supreme Court in *Doe v. Poritz*, 142 N.J. at 63-73, 662 A.2d 367, we think it wise to heed the Supreme Court's advice: *Mendoza-Martinez* is inapplicable outside the context of determining whether a proceeding is sufficiently criminal in nature to warrant criminal procedural protections of the Fifth and Sixth Amendments. See *Austin* v. *United States*, 509 U.S. 602, 610 n.6, 125 L. Ed. 2d 488, 113 S. Ct. 2801 (1993)]."

See also *Opinion of the Justices*, 423 Mass. at 1222 ("without some indication of the weight and priority of these [*Mendoza-Martinez*] factors, however, that test risks an unmanageable indefiniteness.").

The New Jersey Supreme Court in *John Doe* concluded that the *Mendoza-Martinez* test was not relevant to an ex post facto analysis. *John Doe* observed that the *Mendoza-Martinez* Court "nowhere suggest[ed] that consideration of all of the factors together is somehow the legally required method of resolving the issue" of whether a statute was penal or regulatory. 142 N.J. at 65. *John Doe*, after rejecting the *Mendoza-Martinez* factors, describes the method of determining "punitive impact":

"We do not hold that legislative intent is the sole determinant of 'punishment' despite the dissent's claim that we do. Obviously, what the Legislature does is as important as what it says. Characterization of a provision or sanction as punishment depends, as we have noted, not only on the legislative purpose but on the implementing provisions. If the implementing provisions go beyond that regula-

tory purpose—if they are 'excessive' in fact—and have a punitive impact, punishment results, regardless of claimed regulatory intent. That is the central thrust of *Austin* [*v. United States*, 509 U.S. 602, 125 L. Ed. 2d 488, 113 S. Ct. 2801 (1993),] and [*United States v.*] *Halper*[, 490 U.S. 435, 104 L. Ed. 2d 487, 109 S. Ct. 1892 (1989),] and of our analysis in this opinion." 142 N.J. at 75.

In resolving whether a statute has such a punitive impact as to make it punishment, the *Artway* court speaking through Judge Becker, in a scholarly analysis, synthesized several recent United States Supreme Court cases (*California Dept. of Corrections v. Morales*, 514 U.S. 499, 131 L. Ed. 2d 588, 115 S. Ct. 1597 [1995]; *Montana Dept. of Rev. v. Kurth Ranch*, 511 U.S. 767, 128 L. Ed. 2d 767, 114 S. Ct. 1937 [1994]; *Austin v. United States*, 509 U.S. 602, 125 L. Ed. 2d 488, 113 S. Ct. 2801 [1993]; and *Halper*, 490 U.S. 435). 83 F.3d at 1254-61. The Third Circuit in *Artway* developed a three-prong test for declaring when a legislative act constitutes "punishment" for ex post facto and double jeopardy purposes: whether (1) the actual purpose of the law is punitive or remedial, (2) the objective purpose is punitive or remedial, and (3) its effect is sufficiently punitive. The objective purpose prong, in turn, had three subparts. Applying this three-prong test to New Jersey's sex offender registration law, known as Megan's Law. *Artway* determined that the registration requirements of the law did not violate the Ex Post Facto Clause or the Double Jeopardy Clause. 81 F.3d at 1264-67. The claims concerning the notification portion of the law were not ripe for review because Artway had left New Jersey and had yet not been classified as an offender subject to notification. 81 F.3d at 1246-53.

*W.P. v. Poritz*, 931 F. Supp. 1199 (D.N.J. 1996), addressed ex post facto and double jeopardy claims concerning the notification provisions in Megan's Law. *W.P.* arose from a class action filed by New Jersey sex offender registrants who had been notified of their classifications as Tier II (moderate risk) or III (high risk) offenders for sex offenses committed before the effective date of the law. Upholding the notification provisions against those claims, *W.P.* followed the outlines of the test set forth in *Artway*, but noted that *United States v. Ursery*, 518 U.S. ___, 135 L. Ed. 2d 549, 116 S. Ct. 2135 (1996), decided after *Artway*,

"alters the analysis to be employed in the case at bar." *W.P.*, 931 F. Supp. at 1207. The *W.P.* court said:

"*Ursery* expressly rejects the philosophical foundation of *Artway*: that a universal rule for the definition of 'punishment' can and should be derived through a 'synthesis' achieved from analyzing the Supreme Court's recent decisions in *Halper, Austin, Kurth Ranch* and *Morales*. . . .

"The Supreme Court has now stated that *Halper, Austin, Kurth Ranch,* (by implication *Morales*), and now *Ursery* cannot be employed to establish a 'synthesis' that generates a universal analytical framework for defining 'punishment' in all cases." 931 F. Supp. at 1208-09.

However, *W.P.* observed that certain considerations common to those cases should be employed in deciding whether the notification provisions imposed "punishment":

"These common considerations are the expressed intent of the legislature as reflected in the legislation itself and the legislative history; the 'purpose' of that legislation, viewed objectively, particularly if that demonstrates a potential for a more punitive objective; a balancing of remedial and punitive goals; an analysis of how such laws have been considered historically, if there is any clear historical analogue; and a review of the 'effect' of such legislation, if that effect is extreme or severe." 931 F. Supp. at 1209.

*W.P.* noted further:

"What *Ursery* teaches us, however, is that such considerations may not be transformed into a rigid series of hurdles which must be surmounted, one after the other, before the legislation can survive an ex post facto or double jeopardy challenge. Rather this Court, in an analysis similar to that in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) (although the factors considered are not identical), must weigh these considerations in a less structured fashion to reach its decision." 931 F. Supp. at 1209.

Because of the importance of *Halper* and *Austin* in the punitive/nonpunitive analysis of sex offender registration and disclosure statutes advanced in *John Doe* and *Artway*, we turn to a review of *Ursery*. *Ursery* considered the *Mendoza-Martinez* factors in its double jeopardy analysis. In *Ursery*, the Court considered whether civil forfeiture proceedings under 21 U.S.C. § 881(a)(6) and (7) (1994) violated the Double Jeopardy Clause. The Court reviewed two cases. In the Sixth Circuit case, *United States v. Ursery*, 59 F.3d 568 (6th Cir. 1995), the government initiated civil forfeiture proceedings against Ursery's house, alleging it had been used to

facilitate illegal drug transactions. Ursery was later convicted of a drug charge. In *U.S. v. $405,089.23 U.S. Currency*, 33 F.3d 1210 (9th Cir. 1994), civil *in rem* proceedings were filed against certain items, including currency allegedly involved in a money laundering scheme and felonious drug transactions. The owners were later convicted on drug and money laundering charges, and forfeiture was granted against their property. The Sixth Circuit reversed Ursery's conviction, and the Ninth Circuit in *$405,089.23* reversed the forfeiture judgment, both courts relying on *Halper* and *Austin*. In a split decision (Justice Stevens dissenting; Justices Kennedy, Scalia, and Thomas concurring), the Supreme Court reversed, distinguishing *Halper*, *Austin*, and *Kurth Ranch* and relying instead upon *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 79 L. Ed. 2d 361, 104 S. Ct. 1099 (1984).

The Court observed that *Halper* considered whether a civil penalty constituted "punishment" for double jeopardy purposes. In *Halper*, a fine of $130,000 was sufficiently disproportionate to the government's damages and expenses, estimated at $585, as to constitute a second punishment in violation of double jeopardy. 490 U.S. at 437, 452. The *Ursery* Court noted the historical distinction between civil forfeiture and civil penalties and that the balancing test used in *Halper* (value of the fine versus amount of the government's damages) had never been applied in forfeiture cases. 116 S. Ct. at 2145.

The *Ursery* Court also distinguished *Austin*: "The holding of *Austin* was limited to the Excessive Fines Clause of the Eighth Amendment, and we decline to import the analysis of *Austin* into our double jeopardy jurisprudence." 116 S. Ct. at 2147. *Kurth Ranch* was distinguished because it dealt "with a tax proceeding under the Double Jeopardy Clause." 116 S. Ct. at 2147.

After distinguishing *Halper*, *Austin* and *Kurth Ranch*, the *Ursery* Court stated: "[T]his Court consistently has found civil forfeitures not to constitute punishment under the Double Jeopardy Clause." 116 S. Ct. at 2147. The Court then applied the two-part test used in *89 Firearms* (taken from *Ward*, 448 U.S. at 248-49) to determine whether a forfeiture proceeding is civil or criminal in nature:

"First, we ask whether Congress intended proceedings under 21 U.S.C. § 881, and 18 U.S.C. § 981, to be criminal or civil. Second, we turn to consider whether the proceedings are so punitive in fact as to 'persuade us that the forfeiture proceeding[s] may not legitimately be viewed as civil in nature,' despite Congress' intent. *89 Firearms*, 465 U.S. at 366." 116 S. Ct. at 2147.

Finding intent that the proceedings are civil, the Court in *Ursery* moved to the second stage and found little evidence "suggesting that forfeiture proceedings . . . are so punitive in form and effect as to render them criminal despite Congress' intent to the contrary." 116 S. Ct. at 2148.

*Ursery* then identified the nonpunitive goals of the forfeiture provisions (encouraging property owners not to permit their property to be used for illegal purposes; ensuring people do not profit from illegal acts). 116 S. Ct. at 2148-49. The Court ended its analysis with the following:

"Other considerations that we have found relevant to the question whether a proceeding is criminal also tend to support a conclusion that § 981(a)(1)(A) and §§ 881(a)(6) and (a)(7) are civil proceedings. See *Ward*, [448 U.S. at] 247-248, n. 7, 249 (listing relevant factors and noting that they are neither exhaustive nor dispositive)." 116 S. Ct. at 2149.

The cite to *Ward* refers specifically to the *Mendoza-Martinez* factors. The Court then discussed four of those factors, finding that (1) *in rem* civil forfeiture has historically not been regarded as punishment; (2) the government need not demonstrate scienter to establish forfeiture; (3) though forfeiture may serve the purpose of deterrence, that purpose may serve civil as well as criminal goals; and (4) though the statutes are tied to criminal activity, this was not sufficient to render the statutes punitive. 116 S. Ct. at 2149. *Ursery* blunted deterrence as a factor pointing toward penal effect, at least in the forfeiture context.

Because *Ursery* was decided on the grounds that civil *in rem* forfeiture was determined not to impose punishment for double jeopardy purposes, the majority's use of the two-part test from *89 Firearms* (including the *Mendoza-Martinez* factors) for determining whether a proceeding is criminal in nature implies that the *Mendoza-Martinez* factors should be considered as part of the determination of whether punishment has been imposed. *Ursery*

leaves open the question of whether that same test should be used as part of ex post facto analysis.

The majority in *Ursery* labeled the sweeping language in *Halper* to the effect that "[a] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment" as dictum. *Halper* was confined to the narrow context of its own facts: a civil penalty vastly disproportionate to the government's damages and expenses. 116 S. Ct. at 2145, n.2.

The *W.P.* court read *Ursery* as changing the approach the Third Circuit used in *Artway* to a less rigid one. The "considerations" used in *W.P.* to determine if the Megan's Law notification provision imposed punishment, 931 F. Supp. at 1209, are similar to the two-part test in *Ward, 89 Firearms,* and *Ursery,* with a few of the *Mendoza-Martinez* factors added. Although often re-labeled, the *Mendoza-Martinez* factors continue to reappear in some form in ex post facto and double jeopardy analysis. Certain factors are given more weight in the analysis and others totally disregarded, depending on the context. We conclude that *Ursery* has endorsed the *Mendoza-Martinez* factors for consideration in the punitive/nonpunitive effect analysis.

## Ex Post Facto Challenges in Other Jurisdictions

Sex offender registration and disclosure statutes have been constitutionally challenged, often on the grounds that such statutes are ex post facto laws. KSORA's disclosure section, K.S.A. 22-4909, appears to be the broadest provision to receive an ex post facto challenge. Neither the parties in this case nor our independent research have located a case upholding the constitutionality of a sex offender statute providing for unlimited public disclosure. Statutes held constitutional when challenged on ex post facto grounds have provided for: no public disclosure, see, *e. g., Snyder v. State,* 912 P.2d 1127, 1129 (Wyo. 1996) (Wyoming statute allows access only to those already authorized by law to receive criminal history information); limited disclosure, see, *e.g., Noble,* 171 Ariz. at 176 (in Arizona, information only available in statutorily specified circumstances where it serves regulatory purpose); or carefully tai-

lored community notification, see, *e.g., John Doe v. Poritz*, 142 N.J. 1, 74, 662 A.2d 367 (1995) (New Jersey statute tailors scope of notification to offender's risk level).

Of the sex offender registration laws that have successfully overcome ex post facto challenges, none have provided for unlimited public access to the registered sex offender information. See, *e.g., Opinion of the Justices*, 423 Mass. at 1227 (pending Massachusetts legislation proposing community notification law not facially punitive); *John Doe*, 142 N.J. at 73-75 (under New Jersey law, community notification appropriate only after a due process hearing involving judicial review determining that the offender poses sufficient risk); *State v. Costello*, 138 N.H. 587, 590, 643 A.2d 531 (1994) (New Hampshire registered information kept confidential by authorities); *Ward*, 123 Wash. 2d at 502 (Washington law authorizes release of sex offender registration information to the public when necessary for public protection); *People v. Starnes*, 273 Ill. App. 3d 911, 653 N.E.2d 4 (1995) (Illinois child sex offender registration information kept confidential; Ill. Cons. Stat. Ann. ch. 730, 150/9 [Smith-Hurd 1996 Supp.]); *Manning*, 532 N.W.2d at 246 (Minnesota registered information kept private and used only for law enforcement purposes).

The Arizona sex offender registration act was upheld in *Noble*, 171 Ariz. 171. The Arizona Supreme Court reviewed two conflicting Court of Appeals panel decisions, after each panel had applied the *Mendoza-Martinez* factors to determine if the registration requirement was punishment. The Arizona registration requirements were similar to those in KSORA. See Ariz. Rev. Stat. Ann. § 13-3821 (1989). Although the law contained no notification provisions, it did provide for release of information concerning the registered sex offender's record to

"noncriminal justice agencies for evaluating prospective employees, public officials, or volunteers; governmental licensing agencies for evaluating prospective licensees; prospective employers and volunteer youth-service agencies whose activities involve regular contact with minors; and the department of economic security and the superior court for determining the fitness of prospective custodians of juveniles." 171 Ariz. at 176 n.8 (citing Ariz. Rev. Stat. Ann. § 41-1750[B][8], [9], [11], [13] [1992]).

*Noble* reasoned that registration did not impose any affirmative disability or restraint on the offender. Registration did not restrain or inhibit the offender's movement or activities, although it did make information available in "statutorily specified circumstances where it serves a clearly regulatory purpose." 171 Ariz. at 176. *Noble* observed that registration has traditionally been viewed as punitive (referencing Nathaniel Hawthorne's The Scarlet Letter), but noted that the provisions limiting access to the information "dampen[ed] its stigmatic effect." 171 Ariz. at 177. The registration requirement served a regulatory purpose by facilitating law enforcement and aiding in investigative work; and as applied to child sex offenders (because of more significant risk of recidivism), was not excessive in relation to the nonpunitive purpose. 171 Ariz. at 177-78. *Noble* implies that if disclosure of the information had not been statutorily limited, it would be regarded as the kind of affirmative disability or restraint usually associated with criminal punishment. 171 Ariz. at 176.

The constitutionality of the Washington sex offender registration and disclosure law also withstood an ex post facto challenge. *Ward*, 123 Wash. 2d 488. The appellants in *Ward* attacked the disclosure provisions, which provided that "[p]ublic agencies are authorized to release relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection." 123 Wash. 2d at 502 (quoting Wash. Rev. Code § 4.24.550[1] [1994]). *Ward* noted that existing law already provided for public disclosure of conviction information. 123 Wash. 2d at 501.

In interpreting the statutory disclosure provisions, *Ward* judicially imposed the following restrictions:

"We note that the statute [Wash. Rev. Code § 4.24.550(1)], on its face, requires the disclosing agency to have some evidence that the offender poses a threat to the community. Absent evidence of such a threat, disclosure would serve no legitimate purpose. Therefore, we hold that a public agency must have some evidence of an offender's future dangerousness, likelihood of reoffense, or threat to the community, to justify disclosure to the public in a given case. This statutory limit ensures that disclosure occurs to prevent future harm, not to punish past offenses.

". . . An agency must disclose only that information relevant to and necessary for counteracting the offender's dangerousness.

"[T]he geographic scope of dissemination must rationally relate to the threat posed by the registered offender. . . . The scope of disclosure must relate to the scope of the danger. . . .

"[W]e leave to the appropriate agencies the specific decisions of whether, what, and where to disclose within the parameters outlined above." 123 Wash. 2d at 503-04.

*Ward* concluded that Washington's disclosure provisions did not "alter the standard of punishment which existed under prior law," finding "that the statutory limits on disclosure ensure that the potential burdens placed on registered offenders fit the threat posed to public safety." 123 Wash. 2d at 504. The disclosure provision in KSORA contains no restrictions. Registration information is "open to inspection in the sheriff's office by the public." K.S.A. 22-4909.

The Supreme Court of New Hampshire upheld that state's sex offender registration act from an ex post facto attack in *Costello*, 138 N.H. 587. The sex offender was required to register with the state police and to report a current address annually to the local law enforcement agency. *The information is kept confidential within the law enforcement community. Costello* held that the nonpenal, or regulatory purpose of the legislation was "manifest" and that the punitive effect of registration was *de minimis*. 138 N.H. at 591.

In *John Doe*, 142 N.J. 1, the New Jersey Supreme Court found New Jersey's Megan's Law to be lacking in its original form but by the court's crafting of a judicial review procedure, upheld the act against ex post facto, double jeopardy, bill of attainder, and cruel and unusual punishment attacks. *John Doe* determined that the registration and notification laws implicated a sex offender's liberty interest in privacy and reputation and triggered due process rights. The fundamental fairness doctrine required a hearing and accompanying judicial review before statutory notification of the community for sex offenders identified as moderate and high risk (Tier II and Tier III). 142 N.J. at 107. *John Doe* interpreted the statute and judicially revised the Attorney General Guidelines on risk level assessment and notification to conform with the court's notion of

what was required to provide adequate due process. The court augmented its holding in a later order by specifically outlining the procedure to be followed in such review. *John Doe* acknowledged that the "basic attack on these laws is the alleged excessiveness of community notification." 142 N.J. at 29.

*State v. Babin*, 637 So. 2d 814 (La. App. 1994), considered conditions of parole requiring Babin, a sex offender, to notify people within a 1-mile radius of his residence and the school district superintendent of Babin's conviction. He was also required to publish notice of his conviction twice within the official journal of the local governing authority, in compliance with legislation enacted after Babin committed the crimes. Without any analysis, the *Babin* court declared the notification requirements unconstitutional as ex post facto legislation. But see *State v. Sorrell*, 656 So. 2d 1045, 1048 (La. App. 1995) (Louisiana sex offender registration statute was not an ex post facto law as applied to a rapist convicted before enactment but paroled afterwards. Registration and notification requirements were imposed as a condition of parole, and the law in effect at the time of release should govern the terms of release.).

In *State v. Manning*, 532 N.W.2d 244 (Minn. App. 1995), the Court of Appeals of Minnesota determined that the Minnesota sex offender registration statute was not an ex post facto law. The registered information includes address, fingerprints, photograph, and other information required by the bureau of criminal apprehension, and such information is only to be used "for law enforcement purposes." Minn. Stat. § 243.166 (1992 & 1993 Supps.). The *Manning* court determined that the statute did not impose an affirmative restraint or disability. *Manning* reasoned that registration is not historically regarded as punishment (*noting that the registration information is confidential*), the deterrent effect of registration is minimal, and the law has a nonpunitive purpose: to help police investigations. 532 N.W.2d at 248.

Although not an ex post facto case, the California Supreme Court determined in *In re Reed*, 33 Cal. 3d 914, 191 Cal. Rptr. 658, 663 P.2d 216 (1983), that registration was a form of punishment. The California sex offender registration statute was challenged as cruel and unusual punishment as applied to a misdemeanor offender

convicted of soliciting "lewd or dissolute conduct" from an undercover officer in a public restroom. Under the statute, the misdemeanant was required to register for life with the local police as a sex offender. The offender could petition for release from the registration requirement, but there was no procedure for expungment of the initial registration. The court first consulted the *Mendoza-Martinez* factors and determined that the registration requirement was a form of punishment. The court then applied the three-part test of *In re Lynch*, 8 Cal. 3d 410, 105 Cal. Rptr. 217, 503 P.2d 921 (1972), and determined that the "punishment" was "cruel or unusual" as applied to Reed. The court noted that relatively minor conduct, such as a flirtation accompanied by touching done in a public place, could constitute an offense. Such an offender did not pose a grave threat to society, warranting permanent police surveillance.

### Federal Cases

*Rowe v. Burton*, 884 F. Supp. 1372 (D. Alaska 1994), determined that plaintiff sex offenders were likely to succeed on the merits on their ex post facto challenge to the Alaska registration law and granted a preliminary injunction to prevent public dissemination of sex offender information. *Burton* held that Alaska's act violated the prohibition on ex post facto legislation, "because the law includes a provision providing for public dissemination of information concerning sex offenders whose convictions ante-date the Registration Act." 884 F. Supp. at 1380.

In engaging in an ex post facto analysis, the *Burton* court first acknowledged that the "statutory design displays a purpose to regulate present circumstances, not to punish." 884 F. Supp. at 1377. *Burton* then considered the *Mendoza-Martinez* factors in determining whether the law had a punitive effect. *Burton* reasoned: (1) the public dissemination provisions, which would subject the registrants to "public stigma and ostracism that would affect both their personal and professional lives," imposed an affirmative disability or restraint, showing a punitive effect; (2) registration was not a "concept which this court perceive[d] to be imbued by history with a punitive connotation"; (3) the act was premised upon "past know-

ingly wrongful conduct of the registrant," and therefore the scienter factor was present, indicating punitive effect, although that factor was to be given only "light weight"; (4) while the registration requirement, by itself, may have imposed only a *de minimis* burden, the public disclosure mechanism could have both a deterrent and retributive effect; (5) little weight is given to the factor of whether the behavior to which the sanction applied was already a crime; and (6) the law had an alternative nonpunitive purpose, but the public dissemination feature of the law left open the possibility that the sanction may be excessive in relation to its legitimate nonpunitive effect. 884 F. Supp. at 1378-79. *Burton* noted that in none of the other cases litigating the constitutionality of sex offender registration acts were the public dissemination provisions, if any, as broad as in Alaska's law. 884 F. Supp. at 1380.

We note that the Alaska statute makes some information in a central registry confidential but allows for public disclosure under regulations to be adopted by the Department of Public Safety. 884 F. Supp. at 1376. KSORA's disclosure provision appears broader, as none of the required information is confidential.

*Artway v. Attorney General of State of N.J.*, 81 F.3d 1235 (3d Cir. 1996), as was *Burton*, was initiated by a motion for an emergency temporary injunction against enforcement of sex offender registration. The federal district court granted the motion in part, determining that the notification provision of New Jersey's Megan's Law was ex post facto legislation, although the registration provisions were upheld. The Third Circuit affirmed the federal district court as to the registration provisions but vacated the judgment as to the notification provisions, determining that the claims concerning those provisions were not ripe. 81 F.3d at 1242.

The New Jersey registration requirements are similar to those of other states, including Kansas. However, the New Jersey law provides for a procedure authorizing release of "relevant and necessary information concerning registrants when . . . necessary for public protection." 81 F.3d at 1243. The local county prosecutor takes the registration information, consults with the county prosecutor of conviction, and, using a non-exclusive list of statutory factors and Attorney General's Guidelines, makes a determination

of the risk of reoffense for the registrant. A low risk offender is classified in Tier I, moderate risk in Tier II, and high risk in Tier III. Each tier requires different levels of notification. *For Tier I, only law enforcement agencies likely to encounter the offender are notified.* For Tier II, local schools, licensed day care centers and summer camps, and other community agencies and organizations involved in the care or supervision of children or support of battered women and rape victims are notified. For Tier III, members of the public likely to encounter the registrant are notified. Notification under Tiers II and III includes the registrant's name, photograph, physical description, the offense, address, place of employment or schooling, and a description and license plate number of the registrant's vehicle. The notification is also accompanied with a warning as to consequences of and criminal sanctions for acts of vandalism, threats, and assaults against a registrant. *Tier II notice recipients are also informed that the information is not to be shared with the public and is to be used only to assist in protecting children, battered women, or rape victims under their care.* The Tier I registration provisions of Megan's Law upheld in *Artway* limited disclosure to law enforcement agencies. The information is not open to the public. 81 F.3d at 1264. As previously mentioned, the Third Circuit in *Artway* did not address the constitutional claims concerning Tier II and III classifications and community notification.

Tier I registration is similar to the Kansas registration provision existing before KSORA. See K.S.A. 1993 Supp. 22-4909 (no public disclosure). Under K.S.A. 22-4907, the information a sex offender is required to provide upon registration is not as extensive as that required under the New Jersey law. However, K.S.A. 22-4907 was recently amended to significantly expand the list of required information. L. 1996, ch. 224, § 5.

*W.P. v. Poritz*, 931 F. Supp. 1199 (D.N.J. 1996), upheld the constitutionality of the notification provisions in Megan's Law after applying the considerations previously discussed.

In *Doe v. Pataki*, 919 F. Supp. 691 (S.D.N.Y. 1996), the federal district court granted the class-action plaintiffs' motion for prelim-

inary judgment against retroactive application of the notification provisions of New York's version of Megan's Law (modeled after New Jersey's law), but denied the motion as to the registration provisions. In determining that the public notification provisions were punitive, the court relied upon five of the *Mendoza-Martinez* factors, finding that the public notification provisions: (1) have traditionally been viewed as punitive; (2) serve a traditional punishment goal—deterrence; (3) impose an affirmative disability or restraint; (4) are triggered by behavior that is already a crime; and (5) have already led to excessively harsh results. 919 F. Supp. at 700-01.

## Ex Post Facto Analysis of KSORA

We acknowledge the statements in *Artway*, 81 F.3d at 1262, and *John Doe*, 142 N.J. at 72-73, that the *Mendoza-Martinez* factors are not the test for resolution of the ex post facto issue. However, we also recognize that those factors have provided guidance to a number of state (*e.g., Ward, Noble*) and federal courts (*W. P., Pataki*, and *Burton*) in considering ex post facto challenges to sex offender registration legislation.

Because *Ursery* referenced the *Mendoza-Martinez* factors in its double jeopardy analysis, we believe those factors, to the extent they may be helpful, merit consideration in evaluating Myers' ex post facto claim. We do not apply the factors as a pass/fail test or in a checklist fashion. We believe that some add little, if anything, to the analysis, while others provide significant guidance. Discussed below are those factors that we believe should be emphasized in determining whether KSORA has a punitive effect sufficient to override its nonpunitive legislative purpose.

## Affirmative Disability or Restraint

The KSORA registration requirement imposes no affirmative disability or restraint, because the offender's movements within or without the community are not restricted. The act of registration is the only requirement. Although there may be discomfort in registration, Myers, who carries the burden under his claim that KSORA is unconstitutional, has furnished no evidence of punish-

ment flowing from registration alone. We hold that KSORA's registration requirement does not impose punishment; thus, our ex post facto inquiry as to registration ends. However, we must also consider the provision in K.S.A. 22-4909 that the registered information is open to public inspection in the sheriff's office. Although 22-4909 does not impose any affirmative dissemination requirements on the authorities, it imposes no restrictions on anyone who inspects the information. The information could be routinely published in the newspaper or otherwise voluntarily disseminated by anyone. The practical effect of such unrestricted dissemination could make it impossible for the offender to find housing or employment. We find that the KSORA public disclosure provision does impose an affirmative disability or restraint. Unrestricted public access to the registered information leaves open the possibility that the registered offender will be subjected to public stigma and ostracism.

### Retribution and Deterrence

Registration has an obvious deterrent effect. A registered offender is more likely to think twice before committing another sex offense when the person knows that the local sheriff already has the offender's name on a list. We acknowledge the statement in *Ursery*, 116 S. Ct. 2149, that "the purpose of deterrence . . . may serve civil as well as criminal goals." The stigma that will accompany public exposure of the registered information could be viewed as a form of retribution. We find that the KSORA public disclosure provision may have both a deterrent and retributive effect. However, the nonpunitive purpose of the statute cannot be accomplished without informing the public that a sex offender is in its midst. If the statute limited public disclosure to that necessary to protect the public, then its deterrent effect could be viewed as incidental to its nonpunitive purpose. Unlimited public access to the registry provides a deterrent or retributive effect that goes beyond such purpose.

### Excessiveness

This is the key factor in our analysis. In other jurisdictions, for the sex offender registration laws found to be unconstitutional as

ex post facto laws, the focus has been on the excessive scope of public disclosure of registered information. See, *e.g.*, *Pataki*, 919 F. Supp. at 700-01; *Burton*, 884 F. Supp. at 1376.

KSORA places no restrictions on who is given access to the registered offender information or what that person does with the information. The print or broadcast media could make it a practice of publishing the list as often as they chose. Anyone could distribute leaflets containing the registered information anywhere and anytime. We observe that under K.S.A. 21-4006, it is a misdemeanor to maliciously expose a paroled or discharged person as having been charged with or convicted of a felony with the intent to interfere with such person's employment or business. K.S.A. 21-4006 does not apply "to any person or organization who furnishes information about a person to another person or organization requesting the same." However, the crime of "maliciously exposing a paroled or discharged person" does not address exposure of sex offender registration for any other purpose, such as interference with a sex offender's housing situation. The unrestricted public access leaves open the probability that a registered sex offender could suffer the kind of public stigma and ostracism that concerned the *Artway* court, although KSORA does not provide for any affirmative notification.

"In particular, Artway argues that Megan's Law is analogous to that most famous badge of punishment: the Scarlet Letter. 'There can be no outrage . . . against our common nature,—whatever be the delinquencies of the individual,—no outrage more flagrant than to forbid the culprit to hide his face for shame; as it was the essence of this punishment to do.' Nathaniel Hawthorne, *The Scarlet Letter* 63-64 (Random House 1950) (1850). Like the Scarlet Letter, Artway contends, Megan's Law results in public ostracism and opprobrium: it would subject him to potential vigilantism, impair his opportunities to work, and damage his abilities to develop and maintain stable relationships. In his submission, its 'remedial' purpose—to protect the public from him—seeks to brand him as an outcast. Such a shunning by one's community is the essence of historical punishment, Artway contends.

"*Artway's argument has considerable force, but the notification issue is not before us.* We evaluate only registration, and that provision bears little resemblance to the Scarlet Letter. Registration simply requires Artway to provide a package of information to local law enforcement; registration does not involve public notification. *Without this public element, Artway's analogy fails. The Scar-*

*let Letter and other punishments of 'shame' and 'ignominy' rely on the disgrace of an individual before his community.* The act of registering with a discrete government entity, which is not authorized to release that information to the community at large (except in emergencies), cannot be compared to public humiliation." 81 F.3d at 1265. (Emphasis added.)

We have acknowledged that merely having a criminal conviction in itself includes "not only the formal penalties and restrictions imposed by law but also collateral sanctions incidentally imposed by society." *State v. Miller*, 214 Kan. 538, 542, 520 P.2d 1248 (1974) (statute authorizing annulment of conviction on application of defendant held constitutional). In *Miller*, we observed:

" '[T]he record of a conviction for a serious crime is often a lifelong handicap. There are a dozen ways in which even a person who has reformed, never offended again, and constantly endeavored to lead an upright life may be prejudiced thereby. The stain on his reputation may at any time threaten his social standing or affect his job opportunities . . . .' " 214 Kan. at 542 (citing *United States v. Morgan*, 346 U.S. 502, 519, 98 L. Ed. 248, 74 S. Ct. 247 [1954]).

The Court of Appeals relied on *Miller* in holding that a statute that retrospectively eliminated a right to have a prior conviction expunged altered the punishment in violation of the Ex Post Facto Clause. *State v. Anderson*, 12 Kan. App. 2d 342, 344-45, 744 P.2d 143 (1987).

"Sexually violent crime" is defined in KSORA as including the following sex-related felony crimes: rape, indecent liberties with a child, aggravated indecent liberties with a child, criminal sodomy, aggravated criminal sodomy, indecent solicitation of a child, aggravated indecent solicitation of a child, sexual exploitation of a child, aggravated sexual battery, a felony conviction under a prior law comparable to any of above crimes, a federal or other state felony conviction that would be a sexually violent crime in this state, an attempt, conspiracy or criminal solicitation of any of the above crimes, and "any act which at the time of sentencing for the offense has been determined beyond a reasonable doubt to have been sexually motivated." K.S.A. 22-4902(b). Although all of the other categories are limited to felonies, the last category could apparently include any "sexually motivated" act resulting in an "offense."

Several of the listed felonies include what otherwise might be viewed as voluntary sexual contact between two persons that is considered criminal because of the minority status of the victim and the fact that the victim is not married to the accused: indecent liberties with a child, K.S.A. 21-3503(a) (lewd touching or fondling or solicitation of same with a 14-15 year old); aggravated indecent liberties with a child, K.S.A. 21-3504(a)(1) (sexual intercourse with a 14-15 year old); criminal sodomy, K.S.A. 21-3505(a)(2) (sodomy with a 14-15 year old); indecent solicitation of a child, K.S.A. 21-3510(a) (soliciting a 14-15 year old to commit an unlawful sexual act, or persuading such person to enter a vehicle or building for such purpose). As an example, does every 18 year old (or 16 or 17 year old prosecuted as an adult) who has a voluntary sexual relationship with a 15 year old, is convicted of one of the above crimes, and is registered as a "sex offender" pose a sufficient risk of reoffense that the registered information should be subject to unrestricted public access?

K.S.A. 22-4908 does provide a mechanism whereby an already registered sex offender may petition the court for relief from the duty to continue registering. However, this does not address the concern of whether it is initially appropriate for the public to have access to the offender's registered information. KSORA does not allow for any such individualized determination.

Whether we apply the New Jersey Supreme Court's approach in *John Doe*, the three-prong analysis in *Artway*, the considerations listed in *W.P.*, or the *Mendoza-Martinez* factors, we reach the same conclusion: For Myers, KSORA's disclosure provision must be considered punishment. We hold that the legislative aim in the disclosure provision was not to punish and that retribution was not an intended purpose. However, we reason that the repercussions, despite how they may be justified, are great enough under the facts of this case to be considered punishment. The unrestricted public access given to the sex offender registry is excessive and goes beyond that necessary to promote public safety.

Because KSORA's disclosure provision makes more burdensome the punishment for a crime after its commission, we conclude

K.S.A. 22-4909, as applied to Myers, violates the constitutional prohibition against ex post facto laws.

We emphasize we are not balancing the rights of Myers or other sex offenders against the rights of his or their victims. What we are addressing is the right of every citizen, in this case, Myers, to test a claim of constitutional infringement arising from retroactive legislation. Regardless of legislative motivation, we have a duty to entertain such a claim when asserted and to resolve the tension between the positions of Myers and the State.

Public access to sex offender registration is a matter of legislative public policy. Although we defer to the legislature on policy matters, we must, however, exercise our duty of analysis when ex post facto claims impact legislative policy. Would-be sex offenders have been on notice since April 14, 1994, when KSORA became law, that if they commit certain crimes they will be subject to public disclosure under K.S.A. 22-4909. Myers, whose offense was committed before April 14, 1994, had no such notice. The significant date in an ex post facto analysis is the date of the offense, not the date of conviction. *Weaver v. Graham*, 450 U.S. 24, 30-31, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981). To avoid the ex post facto characterization, public access should be limited to those with a need to know the information for public safety purposes. This information should be used by those given access to it only for such purposes. As the law is written now, no such measures are in place for Myers.

### Cruel and Unusual Punishment—Due Process

Myers contends that the disclosure aspect of KSORA constitutes cruel and unusual punishment. The Eighth Amendment to the United States Constitution, applicable to the states under the Fourteenth Amendment (see *Robinson v. California*, 370 U.S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417 [1962]), provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Section 9 of the Kansas Constitution Bill of Rights prohibits infliction of cruel or unusual punishment. Myers also asserts that KSORA violates due process guar-

antees under the Fifth and Fourteenth Amendments to the United States Constitution.

As the State points out, Myers raises these two constitutional issues for the first time on appeal. When constitutional grounds are asserted for the first time on appeal, they are not properly before us for review. *State v. Kaesontae,* 260 Kan. 386, 920 P.2d 959 (1996); *State v. Steadman,* 253 Kan. 297, 306, 855 P.2d 919 (1993).

Myers concedes that his cruel and unusual punishment argument was not raised below, but asserts that it fits within the first two of the following exceptions to the general rule:

"(1) Cases where the newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case;

(2) Questions raised for the first time on appeal if consideration of the same is necessary to serve the ends of justice or to prevent denial of fundamental rights; and

(3) That a judgment of a trial court may be upheld on appeal even though that court may have relied on the wrong ground or assigned a wrong reason for its decision." *State v. Puckett,* 230 Kan. 596, 598-99, 640 P.2d 1198 (1982).

We do not agree. Our reversal based on the ex post facto application of KSORA's disclosure provision negates the substance of Myers' reliance on *Puckett*.

Myers also contends that KSORA violates due process under the Fifth and Fourteenth Amendments to the United States Constitution because the term "rehabilitation" is unconstitutionally vague. K.S.A. 22-4908 provides for a hearing in which the sex offender may petition the court for relief from further registration upon a showing that offender is "rehabilitated." Myers' argument is in the abstract, because he has not petitioned for relief under 22-4908. His claim is unripe. See *Artway,* 81 F.3d at 1242. Myers' due process claim is not within the *Puckett* exceptions. We refuse to consider this issue for the first time on appeal. No fundamental rights have been denied Myers under K.S.A. 22-4908.

## Conclusion

We uphold the constitutionality of the registration requirement in KSORA. K.S.A. 22-4904; K.S.A. 22-4906, and K.S.A. 22-4907. The disclosure provision allowing public access to sex offender reg-

istered information, K.S.A. 22-4909, when applied to Myers, is unconstitutional punishment under the Ex Post Facto Clause. The unlimited public accessibility to the registered information and the lack of any initial individualized determination of the appropriateness and scope of disclosure is excessive, giving the law a punitive effect—notwithstanding its purpose, shown in the legislative history, to protect the public.

We affirm the district court, subject to the unconstitutionality of the K.S.A. 22-4909 disclosure provision as applied to Myers.

To prevent an ex post facto violation, each sheriff's office shall adopt a record system that prevents public access or disclosure of the statements or any other information required by KSORA of any sex offender required to register whose offense occurred before April 14, 1994. Any such statements or other information shall neither be open to the public nor subject to the provisions of the Kansas Open Records Act, K.S.A. 45-215 *et seq.*

Affirmed in part and reversed in part.